(No. 17987.—Affirmed in part and in part reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HENRY CORBISHLY *et al.* Plaintiffs in Error.

*Opinion filed October 22, 1927—Rehearing denied Dec. 7, 1927.*

1. CRIMINAL LAW—*special plea of misnomer is proper.* In a criminal case misnomer is a proper special plea, which must be pleaded in abatement before the plea of not guilty or the misnomer will be waived, and all issues of fact raised by such plea or by the State's replication, should it reply thereto, must be tried by the jury, and the finding must be direct and distinct as to all that is submitted.

2. SAME—*State's reply to a plea of misnomer of defendant's name must be proved beyond reasonable doubt.* On a special plea of misnomer the better practice is to have the defendant re-indicted by the true name suggested by his plea under oath, but where the State replies that the defendant is as well known by the one name as by the other the replication must be proved precisely as alleged and the proof must be beyond a reasonable doubt, as the allegation of the defendant's name is material and essential.

3. SAME—*what must be proved beyond reasonable doubt in all criminal cases.* To convict a defendant of a criminal offense it must be proved beyond all reasonable doubt that the crime was committed against the party alleged to be wronged or injured and that it was committed by the defendant named in the indictment.

4. SAME—*general rule as to when name of defendant is sufficiently alleged.* In naming the defendant in an indictment both the christian and surname must be stated, but it is not necessary that both christian names be stated if the defendant has two, and no harm comes from mis-spelling a name provided it is *idem sonans* with the true spelling, but whatever allegation is made as to the defendant's name must be proved beyond a reasonable doubt substantially as alleged unless such proof is waived by failure of the defendant to plead a misnomer.

5. SAME—*when defendants are guilty of aiding and abetting assault with intent to murder.* In a prosecution of several defendants for assault with intent to murder, defendants who are shown by the evidence to have uttered exclamations urging others who actually committed the assault to attack and kill are as guilty as the principals in the crime and are subject to the same punishment.

6. SAME—*granting of separate trial rests in discretion of court.* Parties indicted jointly are to be tried together, and refusal to grant an application for a separate trial will not constitute ground

for reversal unless it appears from the record that there has been an abuse of the court's discretion.

7. Same—*when admission of evidence that defendants were foreigners will not reverse.* In a prosecution of several defendants jontly indicted for assault with intent to murder, the erroneous inclusion of evidence showing that some of the defendants, as well as some of their witnesses, were foreigners or of foreign birth will not require reversal where the jury are impressed with the fact that they must give a foreigner the same fair and impartial trial as is accorded an American citizen and *that they must consider the testimony of a foreigner in the same fair and impartial manner as that of citizens, and where there is no indication in the record that any of the defendants were prejudiced by reason of the fact that they were foreigners or of foreign birth.

8. Same—*instructions should not contain legal principles not applicable to the case.* Instructions should be confined to the facts and to the law of the particular case in hand, and the jury should not be confused by stating principles of law to them that are not applicable to and have nothing to do with the case.

9. Same—*an instruction stating abstract proposition should require finding of facts stated.* In a prosecution for assault with intent to kill, an instruction stating, as an abstract proposition of law, what constitutes malice and when it is implied from certain acts, should require the jury to find that the facts recited in the hypothesis have been proved, as the mere statement of the abstract proposition without requiring such finding is likely to lead the jury to conclude that the court is of the opinion that the facts stated, on which the proposition of law is based, have been proved.

Writ of Error to the Circuit Court of Franklin county; the Hon. Julius C. Kern, Judge, presiding.

William H. Holly, for plaintiffs in error.

Oscar E. Carlstrom, Attorney General, Roy C. Martin, State's Attorney, and Merrill F. Wehmhoff, (Rufus Neely, and R. E. Smith, of counsel,) for the People.

Mr. Justice Duncan delivered the opinion of the court:

Plaintiffs in error, Henry Corbishly, Frank Corbishly, Stanley Paurez, Ignatz Simmich, (alias Tempo Simmich,) Mike Karadich, (indicted as Mike Krodach,) Steve Meanavich and Eddie Maliski, were jointly indicted and tried

with Charley Corbishly, Martin Simmich, Pete Blazin, Matt Crneavich, William Bartash and Marion Sojat, in the circuit court of Franklin county, for an assault with intent to murder Delbert B. Cobb. All of the defendants pleaded not guilty. Karadich first filed a verified special plea, in which he alleged that his name is Mike Karadich; that he had always been so called and known, and that he was not then, and had never been, called or known by the name of Mike Krodach. To that plea the People filed a replication, in which it is alleged that said defendant is and was called and known as well by the name of Mike Krodach as by the name of Mike Karadich. The jury returned a verdict finding plaintiffs in error and Martin Simmich guilty as charged and the other defendants not guilty. A motion for new trial was filed by plaintiffs in error and Simmich, which was sustained as to Simmich and the case was later dismissed as to him. The motion was overruled as to plaintiffs in error, (herein called defendants,) and judgment and sentence were entered on the verdict that they be imprisoned in the penitentiary for an indeterminate term, except Eddie Maliski, who was sentenced to the Illinois State Reformatory. This is a writ of error for a review of the record.

The assault on the prosecuting witness occurred about ten o'clock of the night of August 11, 1925, at a meeting of Miners' Union No. 992 in Liberty Hall, in the city of Zeigler, in Franklin county. The members of this union were employed at the Joe Leiter mine in Zeigler, known as mine No. 1, and the defendants are all members of that union. Several days prior to the assault a dispute arose at the mine concerning the weighing of the coal, and the men at work there had either walked out or had been called out on a strike by Henry Corbishly, the president of the local. Some of the miners who desired to continue work had taken the matter up with the district officers—Alonzo Fox, district president, and Delbert B. Cobb, district vice-presi-

dent. The dispute had been referred to the district officers of the union. Fox had, under his authority, referred the investigation of the trouble to Cobb. Cobb made the investigation at the direction of Fox by hearing evidence about a week, which was offered by the company and the miners. Cobb decided that under the evidence the strike was in violation of the miners' contract with the operators of the mine, and that Henry Corbishly, president of the local, Steve Meanavich, pit committeeman, and other officers of the local union, should be deposed as such officers, as the terms of the miners' contract provided for their deposal in case of their violation of the contract with the operators. Accordingly Fox caused the usual notice to be posted for a meeting of the local in Zeigler on August 11, 1925, for the purpose of electing new officers and putting the mine to work. On that afternoon some of the members of the union who desired the mine re-opened went to the homes of Fox and Cobb at West Frankfort and asked them to come to the meeting at Zeigler·that night and put the mine in operation. When Henry Corbishly learned of their departure for West Frankfort to see the district officers he went to see the chief of police of Zeigler, Charles Center, and asked him to attend the meeting. Pursuant to the call for the meeting at the hall between 800 and 1000 men assembled there about eight o'clock that evening. The district officers at West Frankfort, president Fox, vice-president Cobb, Hezzie Hindman and David Babbington, members of the executive board, also attended the meeting and arrived at the hall about 8:00 or 8:30 o'clock. Previous to their arrival the members of the local had elected as temporary chairman Frank Skivinski. Matt Crneavich, the regular secretary, had not been deposed and was acting as secretary of the meeting.

Liberty Hall occupies the second story of a two-story brick building which faces west. The main entrance to the hall is a door near the center of the south side of the hall.

A covered stairway extends from this doorway to the side-walk in front of the building. The hall is about fifty feet wide north and south and from sixty to one hundred feet long east and west. There is a raised stage at the east end of the hall and a small room on each side of this stage. There is also a rear stairway in the northeast corner of the hall, which leads to a library on the first floor of the building. In the north wall of the library there is a door opening on an alley on the north side of the building, which extends west to the sidewalk at the front of the building. In front of the stage there is a table for the officers and in the center of the hall about five hundred folding chairs. There are also benches along the north, west and south walls.

On their arrival at the meeting the district officers went to the front part of the hall, near the table. The meeting was called to order, and Fox, Cobb and Babbington made speeches advising the men to return to work and to elect new officers. The defendants Henry Corbishly, Stanley Paurez and Steve Meanavich made speeches opposing the course recommended by the district officers. No action was taken at the meeting on the questions discussed by the speakers. It was finally declared adjourned by the acting chairman, and the miners started to leave the hall by both the front and back stairways. Fox, Cobb and Babbington, who had been sitting near the table, started to leave the hall by the main door on the south side of the hall, Cobb being in the lead, and when they had gotten within about ten or twelve feet of the door Paurez was heard to say something in a foreign language, but the record does not disclose the words that he used or the person or persons whom he addressed or give any interpretation or explanation of any of such words. Immediately after Paurez had thus spoken, a number of the miners in the hall grabbed folding chairs and other things for weapons, rushed toward Cobb and began to assault and beat him. He was struck on the head with a blunt instrument by some person and

knocked down.  He was also struck with folding chairs before and after he was knocked down, and while lying on the floor was stamped and kicked by some of his attackers. The folding chairs were shown to be rather formidable weapons, weighing about eight pounds each.  Fox went to the assistance of Cobb, and in endeavoring to protect him from the assaults was himself struck with chairs—blows which were intended for Cobb.  The whole attack in this part of the hall was shown by the evidence to be directed at Cobb, only, and during this attack on him a number of his attackers and others directing the attack were heard to exclaim, "Close the door!  Don't let him out!"  "Kill the son-of-a-b——!"  "Don't let him get away!"  "Get a rope and hang him!"

Just previous to the attack on Cobb, and immediately after the adjournment of the meeting, a fight was started near the stage between Bert Farthing and his son, who were in sympathy with the strikers, and Asa and Luther Wilson, who were opposers of the strike.  This first fight began about the time the district officers were leaving the table near the stage and continued up to and during a portion of the time the attack was being made on Cobb.  During the attack on Cobb, and while he was lying on the floor, two shots were fired in another part of the hall.  By one of these shots Hezzie Hindman was struck in the thigh and slightly injured, and Mike Saravich, a strike sympathizer, was shot in the stomach and killed.  When these shots were fired the attack on Cobb immediately ceased.  There is testimony to the effect that only one shot was fired.  None of the witnesses for the prosecution knew who fired the shot or shots.  Dan Radison, a witness for the defense, testified that Alex Hargis, one of the parties who was at the meeting at West Frankfort that afternoon, fired the shot.  Hargis did not testify.

As a result of the assaults Cobb received several cut wounds on his head, some of which bled very profusely.

One of these wounds was about four inches in length and extended to the skull. His body, from head to foot, was severely bruised. He had three ribs fractured and was unconscious for a part of the time he was being beaten and kicked. After the shot was fired and after his assailants had run away he crawled to the doorway and was assisted by some of the men in getting down the stairway to the sidewalk, where he fell to his knees because of his weakened condition. He was taken to the Zeigler Hospital, near by, where the wounds on his head were treated by the doctor and where he remained for about ten days or two weeks. The evidence shows that at the time he was assaulted he was in perfect health and weighed about 225 pounds, and that since that time, and up to the trial, he had continuously suffered from pains in the head and body caused by the wounds aforesaid.

During the fight Cobb had a "black jack" in his hand, with which he attempted to defend himself against his attackers. He testified that he took this weapon from one of his assailants. One witness for the defendants referred to this weapon as a "slingshot," and stated that Cobb took it out of his pocket and struck at some of the men with it, and that this started the fight. The overwhelming weight of the evidence is to the effect that Cobb made no attempt to strike anyone until after he was assaulted from various quarters by the men who rushed toward him and began the attack on him. It is not disputed that Cobb was severely beaten and wounded, and it is not seriously disputed here that Cobb was first attacked without any reasonable cause or provocation.

The other direct evidence against and for each of the defendants is in substance the following:

1. Henry Corbishly, the deposed president of the local union, previous to the night of the assault on Cobb had been the leader of the faction that was in favor of a walkout or strike. He attended the meeting as a member of the

union and made a speech, as already stated. Alonzo Fox
testified for the People that there were fifteen or twenty
men around Cobb striking and kicking him, and that Henry
Corbishly was near Cobb with a chair in his hands, drawn
in a position for striking Cobb. Norman Prudent testified
that he saw Corbishly strike Cobb with a chair. Roy Smith
testified that he saw him strike Cobb on the back. Six wit-
nesses testified that they heard Corbishly apply a vile epi-
thet to Cobb and say to his assailants, "Shut the door and
don't let him out!" "Kill him and throw him out!" "Kill
him and get rid of him!" Corbishly testified in his own
behalf that he was not in the hall when the fight started;
that he had gone out of the hall, and as he was going down
the stairway heard a disturbance in the hall. Six other
witnesses for the defense testified that they were at the
meeting; that they left the hall before the fighting was
started and that Corbishly left the hall before the fight be-
gan. Twelve other witnesses testified that Corbishly sus-
tained a good reputation as a peaceable and law-abiding
citizen.

2. Delbert B. Cobb, the prosecuting witness, testified
that he saw Frank Corbishly at the meeting while it was
in progress; that he saw him leaning against the stage and
saw the print of a gun in his shirt. John Hicks testified
that he saw him during the meeting holding his hat over
his shirt. No witness testified that Frank Corbishly took
any part in the attack on Cobb or heard him say anything
during the time he was there. The prosecution practically
admits that he took no part in the actual assault but con-
tends that he was acting in concert with the others.

3. The testimony of seven of the witnesses for the State
is to the effect that Stanley Paurez was standing near the
door on the south side of the hall when the meeting ad-
journed and that as Cobb and Fox came toward the door
he said something in a foreign language, as already stated,
and that immediately thereafter the men in the room be-

gan to attack Cobb. Paurez is a Lithuanian and speaks that
language and also speaks English. There were other Lithu-
anians at that meeting, but there was no attempt by the
prosecution to prove what Paurez said. Cobb testified that
during the fight he heard Paurez say, "Shut the door!"
Nine witnesses for the defense testified that they were at
the meeting and were not far away from Paurez, and that
he did not say anything in a foreign language immediately
before the fight and did not say anything during the attack
on Cobb. Paurez did not testify. It is the theory of the
People that the statement which Paurez made in the Lithu-
anian language was a signal to Cobb's assailants for the at-
tack on him.

4. Alonzo Fox testified that he saw Ignatz Simmich
(alias Tempo) kick Cobb while he was lying on the floor.
George W. Payne testified that he saw Simmich strike Cobb
with a chair while he was on the floor. Jesse Alexander
testified that he saw him strike Cobb with a chair. Floyd
Barrell testified that Simmich raised the chair above his
head and walked toward Cobb, holding the chair in a drawn
position. Cobb testified that Simmich was trying to hit and
kick him while he was trying to get up after being knocked
down, and that Simmich kicked him in the chest and ribs.
Dewey McKissic testified that he heard Simmich call Cobb
a vile name and say to his assailants, "Shut the door!"
"Don't let him out!" "Kill him!" For the defense, George
Starcevich testified that he was seated in the middle of the
hall and that Simmich was beside him; that they stayed
together after the meeting was over; that they went out
of the building together by way of the rear stairs in the
northeast corner of the room and that Simmich took no
part in the fight. Seven witnesses testified that Simmich
bore a good reputation as a peaceable and law-abiding citi-
zen. Simmich did not testify.

5. George W. Payne testified for the People that he
saw Steve Meanavich kick Cobb while he was on the floor.

Thomas Allison saw him pick up a chair in the middle of the room and start toward Cobb with it. Cobb testified that Meanavich kicked him in the side and said, "Close the door!" Floyd Barrell heard him say, "Close that damned door!" John Hicks testified that he heard him say, "Shut the door and don't let them out! Kill them! Don't let them out!" William L. Hill and Albert Bradley testified for the defense that they saw Meanavich pulling men away from Cobb and trying to defend him. Five others testified that he had a good reputation as a peaceable and law-abiding citizen. Meanavich did not testify.

6. Cobb testified that after he had been knocked down Eddie Maliski attempted to hit and kick him. John Hicks testified that he heard Maliski say, "Hang them! Let's get a rope and hang them!" Four nineteen-year-old boys, Sever Katilla, Lovey Kamber, John Gasdik and Steve Pistro, all coal miners living in Zeigler, testified for the defense that they went to the meeting at the hall that night about nine o'clock and remained in the west end of the hall until they left it. These witnesses further testified in substance as follows:

Sever Katilla: Henry Corbishly was addressing the meeting when he got there. After the speaking was over the people in the hall got up and started toward the door on the south side of the hall. When he reached that door he met Eddie Maliski, and he and Maliski went down the stairs to the witness' car and both got into it. The car was standing in front of the hall, and it took them three or four minutes to get to the street on account of the crowd then going down the stairway. As they reached the car he heard a shot fired, and just after that one of the up-stairs windows was knocked out, and he and Maliski ran to the other side of the street. Maliski continued running and did not come back again. The witness then went back to his car. There was no fighting near the door at the time they left the hall. He did not hear anybody say, "Shut the

door!" "Hang them!" "Don't let them out!" "Kill them!" or use any like expressions. On cross-examination he stated that Cobb and Fox were sitting at the table when he was leaving the hall and that Stanlay Paurez was speaking. The meeting had not adjourned.

Lovey Kamber: When he got to the hall he saw Henry Corbishly, Meanavich, Fox and Cobb near the stage. They were making speeches while he was there. When the speaking was over the people started toward the south door. When he got to that door he was with Maliski, and he, Maliski and Katilla went down the stairs together to his (witness') car. No fight was going on at that time. As they passed in front of the soft drink parlor in the lower story of the building they had left he saw a man stick his head out of a window. The witness then ran home and did not see Maliski any more that night. Maliski and he went together from the pool room in Zeigler to Liberty Hall in his car. He was very positive that Maliski went to the hall with him in his car and that no one else was with him. So far as he knew there was no fight going on in the hall when he left it and everything was then "perfectly civil."

John Gasdik: He heard the speeches made at Liberty Hall, and after the speaking was over the crowd got up and started for the south door. There had been no fighting in the room up to that time. He saw Eddie Maliski there. Maliski did not say, "Shut the door! Hang them!" Maliski went down the stairs before he did, but after witness got down the stairs he met Maliski and Katilla in the crowd and they went to Katilla's car standing in front of the building. When they reached the car they heard a shot fired. They then left the car and went across the street from the hall. "While we were there we saw Mr. Cobb coming across the street. We were there two or three minutes before he came." He heard glass falling from an up-stairs window when the shot was fired and did not see Maliski any more that night. They did not leave the hall until the

other men in it started to leave it. There was no fighting going on then.

Steve Pistro: John Gasdik, Sever Katilla and he went to the pool room and from there went together to the miners' hall, leaving Eddie Maliski and Lovey Kamber in the pool room, and Kamber and Maliski came to the meeting in the hall about five minutes later. Some speeches were made at the hall and then a motion was made to adjourn the meeting. The people then arose and went to the south door. Then "we got up and started toward the door." Maliski and Katilla were in front of him and they went out together. The witness walked back into the room and saw the Farthings and the Wilsons fighting. He then ran out of the building the back way and kept running until he got to the pool room. He did not see any fight near the front door. He did not hear anybody say anything in a foreign language before the fighting began. He did not hear anybody say, "Kill them! Throw them out! Shut the door!" Maliski did not testify.

7. Cobb testified that Mike Karadich (indicted as Mike Krodach) struck him on the head with a chair and knocked him down, and that Karadich was the first person to strike him. He also stated that Karadich hit him with a blunt instrument which he held in his hand and knocked him to his knees. Jesse Alexander testified that Karadich was near the door and struck Cobb on the forehead. "He hit him with his hand, but I could not say what he held in his hand. Mr. Cobb went down. Krodach was in the bunch that crowded around Cobb." Karadich testified in his own behalf that he was late at the meeting and stood near the door. As soon as the meeting adjourned he left the hall before any fighting was begun. After he left the hall and while on the street he heard the wrecking of chairs in the hall and heard a shot. Three other witnesses testified that they went to the meeting with Karadich and that he left the hall before any of the fighting was started. Five citizens

of Zeigler testified that Karadich bore a good reputation as a peaceable and law-abiding citizen.

On the issue joined on the plea of misnomer by the defendant Karadich and the replication filed by the State, the court by its instructions directed the jury that if they were satisfied, from a preponderance of all the evidence, that he is as well known by the name of Mike Krodach as by the name of Mike Karadich they should find in favor of the People and against the defendant on that issue and return a special verdict to that effect, and gave to the jury a special form of verdict for such finding. The jury were further instructed that in case they should make such a finding for the State they should then consider the question of the guilt or innocence of the defendant of the offense charged against him in the indictment according to the other instructions given to them on that question. On the special issue George W. Payne, Alonzo Fox and Ode Berry all testified that they knew said defendant as Mike Krodach and had never heard him called Mike Karadich. Cobb knew him as Mike, and did not know what his other name was but referred to him in his testimony as Mike Krodach. Charles Center, chief of police of Zeigler, testified that he had known him well for two years and had never heard him called by any other name than Mike Karadich. Four other witnesses, all residents of Zeigler, testified to substantially the same effect as Center. Elmer J. Lovell, president of the bank in Zeigler where Karadich had an account, testified that he knew him by the name of Mike Karadich, and by that name his account was carried and checks drawn against it by him. The defendant testified that his name is Mike Karadich, and that he had lived in Zeigler for over twenty years, owned his home there and had at all times been known and called Mike Karadich.

It is contended by Karadich that the court erred in instructing the jury to the effect that the People were required to prove, by a preponderance of the evidence, that he is as

well known by the name of Mike Krodach as by the name
of Mike Karadich to entitle the State to a verdict on that
question, and that the People should have been required to
prove that allegation beyond a reasonable doubt. Counsel
for both the State and the defendant have stated in their
briefs and arguments that they were unable to find any case
directly bearing on the foregoing question except that of
*Jones* v. *United States,* 179 Fed. 584. In that case there
was a plea in abatement setting up, in substance, that one
of the grand jurors who had voted with the other grand
jurors upon the filing of the indictment against the defend-
ant was not, and never had been, a citizen of the United
States. · The lower court instructed the jury that as the
naturalization papers offered by the juror appeared to be
regular under the law they should find the issue in favor
of the United States if they were satisfied, beyond a rea-
sonable doubt, that he was the same man that was natural-
ized as Georgis Giustinianovich. The circuit court of ap-
peals did not pass on the question of the measure of proof
to be offered by the government but simply decided that
the court did not err in receiving proof by the government
on that issue and in submitting the question of fact to the
jury, the objection of the defendant being that the plea had
been overruled by another trial judge previous to the trial
of the cause and that no evidence should be permitted to
sustain it and that the jury should not be required to pass
on the issue of fact.

It is now the settled rule of practice in this State that
matters in abatement in criminal cases must be specially
pleaded and that a plea of misnomer is proper, and that
unless the misnomer of the defendant is pleaded in abate-
ment before a plea of not guilty is interposed the mis-
nomer is waived. The rule is otherwise as to the special
defenses of former acquittal, former conviction and a par-
don. (*Hankins* v. *People,* 106 Ill. 628; *People* v. *Brady,*
272 id. 401; *People* v. *Hawkinson,* 324 id. 285; *Davids* v.

*People,* 192 id. 176; *Hauser* v. *People,* 210 id. 253; *People* v. *Beak,* 291 id. 449.) The practice in this State prior to the decision in the case of *Hankins* v. *People, supra,* was in accordance with the practice under the common law as to all special defenses, as was pointed out in that case by the special concurring opinion of Mr. Justice Scholfield. *Durham* v. *People,* 4 Scam. 172; *McQuoid* v. *People,* 3 Gilm. 76; *Freeland* v. *People,* 16 Ill. 380; *Phillips* v. *People,* 55 id. 429; *Bedee* v. *People,* 73 id. 320.

It is a general rule according to the English and American authorities, that where the defendant pleads in defense some special matter, as a former conviction, a former acquittal or a pardon, or where an issue on a plea in abatement is joined, the burden of proof is on the defendant to prove his plea by a preponderance of the evidence, and such issue of fact is tried by a jury. (1 Bishop's New Crim. Proc. secs. 816, 847, 793, 1048, 1095.) All such special pleas are required to be filed or made before the plea of not guilty. At common law, in felony and treason, if in the first instance the prisoner pleads only a dilatory plea or plea in bar, and thereon judgment is rendered against him, he is allowed the plea of not guilty and a trial on the merits. In a misdemeanor, if the defendant tenders a plea in abatement and the plea be held bad on demurrer the judgment is that the defendant answer over, but if a plea in bar be held bad on demurrer the judgment is general against the defendant. On the other hand, if in misdemeanor any plea, however far from the merits, results in an issue of fact, a verdict against the defendant practically convicts him of the offense, because he cannot, of right, answer over, and the judge or jury, as the practice is in other cases, proceeds to fix the punishment. (1 Bishop's New Crim. Proc. secs. 754, 755, and authorities there cited.)

In the case of *Schram* v. *People,* 29 Ill. 162, it was held that where several are indicted for a misdemeanor and issue is joined on a plea of misnomer filed by one and the others

plead not guilty, it is not necessary that a separate jury should pass upon the plea of misnomer, and the whole of the issues may be presented to the same jury, and a general finding of guilty will justify a judgment. It was also further held in that case that a finding against the defendant that the defendant was as well known by one name as the other would have made it the duty of the court to render judgment and impose a fine precisely as it should have done on a verdict of guilty. Chitty on Crim. Law, (vol. 1, 451,) is cited as authority for such holding in prosecutions for misdemeanors. The holding of the court in that case is in accordance with the rule at common law as already stated, the rule being that the verdict of the jury against the defendant on the question of misnomer is equivalent to a verdict of guilty, as it results in the same sentence. This holding is also in accord with the provisions of section 8 of division 13 of the Criminal Code, to the effect that all trials for criminal offenses shall be conducted according to the course of the common law, etc. The *Schram case* is cited by the State as having some bearing on the question now under consideration. It will be observed that the headnotes in that case are not accurate, as the issue to the country was taken upon the replication and not on the plea, as is assumed in said notes. The burden of proof was therefore on the State, by all the authorities, to prove that the defendant was as well known by the name by which she was indicted as by that averred by the plea to be her true name. The case is therefore not an authority to the effect that the burden of proof was on the defendant, or to the effect that the State was only required to prove its allegation by a preponderance of the evidence.

Where there is a plea of misnomer in a criminal case the rule is that if the issue is joined on the defendant's plea he must prove his allegations in the plea *precisely* by the greater weight of the evidence. It is also the rule that if the prosecution in its replication replies that the defendant

is as well known by one name as the other, as was done in the case now under consideration, it must prove its allegations *precisely* as alleged, and proof that he is also sometimes called or known by the name alleged in the indictment is not sufficient to sustain the replication. It is not sufficient to simply show that the. defendant is the same person mentioned in the indictment. All issues of fact raised by the plea in abatement or by the State's replication are to be tried by a jury, and the finding must be direct and distinct to all that is submitted to it. (1 Bishop's New Crim. Proc. sec. 793, pars. 6, 7.) The same rules of pleading apply to special pleas in bar, and it necessarily follows that replications by the State may be of various matters. If the special defense is a former conviction or a former acquittal the State may reply that the present is not the same offense as the former, that the parties are not the same, that the indictment in the former case was bad, that a conviction could not be had on it, or that there is no such record as is alleged. If the special defense is a misnomer, or if the defendant is indicted by his true name and also an alias, the pleas and replication will necessarily vary. The rule must necessarily be in any case that if the State by its replication alleges matters in avoidance of the defendant's plea which do not amount to an affirmance, directly or indirectly, of any material allegation of the indictment, the State will only be required to prove the allegation of its replication by a preponderance of the evidence. If the allegations in the State's replication amount to an affirmance of some material allegation in the indictment the rule must necessarily be that the State is required to prove such allegations beyond a reasonable doubt. If the rule were otherwise, the State would be permitted to violate the rule in criminal cases that it must prove every material allegation in the indictment beyond a reasonable doubt, as all questions of misnomer are waived if not pleaded by the defendant, and if pleaded and settled become no longer questions in the case.

As to the allegations in the indictment, the burden of proof is on the prosecution and it must affirmatively establish every element of the offense beyond a reasonable doubt, and that burden never shifts. The only limit to this doctrine is, that a surplus or immaterial allegation need not be proved unless its form renders it material. The name of a person or corporation must be proved as laid in the indictment, and any material variation is fatal. This rule applies to the names of persons in the indictment charged with the crime, and also to the names of the parties against whom the crime has been committed, if they have names known to the prosecutor or names that he may by proper diligence ascertain. The proof of a criminal offense involves the proof of two distinct propositions or facts beyond a reasonable doubt: First, that the crime was committed against the party alleged to be wronged or injured; and second, that it was committed by the person or persons charged and none other,—in other words, proof of the *corpus delicti* and the identity of the person or persons charged. Both of these facts must be established beyond a reasonable doubt, as well as the name of the defendant. (1 Bishop's New Crim. Proc. secs. 104, 488, par. 3, 488a, par. 3, 671 *et seq.* 676, 677, 681.) In describing or naming a corporation in an indictment as the party wronged, in some jurisdictions it is permissible to give the name in an abbreviated form, or to state the name, or a sufficient part of it, so clearly as to identify the corporation, and in a manner so as not to prejudice the defendant in his right to not be twice placed in jeopardy,—and this is the rule in Illinois. (Ibid. sec. 682.) Both the christian and surname must be stated, but it is not necessary that both christian names be stated if the defendant has two. (Ibid. secs. 683, 684.) The law does not regard orthography, and no harm comes from misspelling a name, provided it is *idem sonans* with the true spelling. (Ibid. sec. 688.) The proof must be of the whole name—not of the christian or surname alone. It must cor-

respond to the allegation or the variance will be fatal. It is to be understood, however, that a variance must be taken advantage of at the proper time in the lower court or it will be waived in the upper court. It is to be further understood that where a misnomer is required to be specially pleaded it will be waived unless pleaded in time.

By the State's replication it in effect admits that defendant Krodach's true name is Karadich, and to avoid the necessity of proving the material allegations in the indictment that Mike Krodach committed the offense charged and that his name is Krodach, it seeks by its replication, as it may legally do to avoid proving that his name is Mike Krodach, to prove that he is as well known by the one name as the other. If it succeeds in that plea by a mere preponderance of the evidence, it will, in effect, avoid proving one of the material allegations in the indictment by the substitution of the other allegation that he is as well known by the name of Mike Krodach as by the name of Mike Karadich, which averment is not contained in the indictment. If the State is thus permitted, in effect, to substitute one averment in an indictment for another and a material allegation, the substituted allegation should be regarded, by every principle of the criminal law and of criminal pleading, as in effect a material averment interposed in lieu of the one in the indictment, and which latter averment it is excused from proving if it succeeds on the issue on its replication. The State should therefore be required to prove its replication beyond all reasonable doubt. If the State, in the case now before us, should succeed in proving this allegation beyond a reasonable doubt, the jury would then be required to consider all the other evidence offered under the plea of not guilty and render a verdict under that plea. If the State should fail to prove its replication beyond a reasonable doubt that would be the end of any further consideration of the indictment as to Mike Krodach, but the State could re-indict him by his true name and proceed to

trial just the same as if he had never been indicted by another name.

We have not been able to find a single authority, English or American, that decides precisely the question here involved, but there are many cases which bear indirectly on that question. The holdings in the various jurisdictions of this country differ materially as to what is a sufficient allegation as to the name of the defendant where he is indicted under two names. The holdings differ as to whether or not it is necessary to prove one or both of the names,— the true name and the alias,—but the holdings are unanimous that whatever allegation as to the name be a sufficient allegation, such allegation must be proved beyond all reasonable doubt, substantially as alleged, unless such proof is waived in the jurisdiction by the failure of the defendant to plead a misnomer. In the case of *Goodlove* v. *State,* 82 Ohio St. 365, 30 L. R. A. (n. s.) 134, it was held that where an indictment charges the accused with having assaulted and killed "Percy Stuckey, alias Frank McCormick," evidence that the defendant assaulted and killed a person commonly known as Frank McCormick will not sustain a verdict of guilty against the defendant unless it also be shown that the Frank McCormick assaulted and killed and Percy Stuckey were one and the same person. In *Evans* v. *State,* 62 Ala. 6, it was held unnecessary to prove that the defendant, designated under an alias, was known and called by both names, but where he was identified by one of them, and it was shown that he was known in the community by that name, that was all that was necessary. There are other decisions which hold to the effect that an indictment for homicide which states the name by which the deceased was known among acquaintances is sufficient even though it be not the true name. There are still others that hold that the indictment is sufficient where the evidence shows that he was known to the accused by the

name charged. (See notes and brief in the case of *Goodlove* v. *State, supra.*)

Our conclusion is that as the practice in this State in criminal cases with reference to pleas in abatement in misdemeanors and felonies is the same as at common law the court erred in charging the jury that the People were required to prove the allegation of their replication by a mere preponderance of the evidence, and the judgment of the court should be reversed as to the defendant Krodach for that reason. We do not think that the preponderance of the evidence shows that he was as well known by the name of Mike Krodach as by the name of Mike Karadich. It may be true that the witnesses for the People who testified on that question knew him by the name of Krodach and none other, yet they were witnesses who did not live in Zeigler and had not known him very long or intimately. The witnesses who testified for Karadich lived in Zeigler, and if he was as well known by the name of Mike Krodach as by his true name they would certainly at some time have heard him called Mike Krodach. We think, as some of the authorities indicate, that where a plea of misnomer is filed, the usual and safer practice is to have the defendant re-indicted by the true name suggested by his plea under oath. As the prosecutor may deny the plea or reply to it, as was done in this case, we have deemed it important that the question raised should be definitely and finally settled and that all doubts be cleared up as to the law in this State.

We further hold that the judgment must be reversed as to the defendants Frank Corbishly and Stanley Paurez, for the reason that the evidence does not show, beyond a reasonable doubt, that they are guilty as charged in the indictment. The evidence is set out in substance in this opinion and no further comment is necessary as to Corbishly. As to Paurez, Cobb was the only witness that testified to any fact tending to show his guilt, which is, in substance, that he heard Paurez say, "Shut the door!" Against his evi-

dence there are nine witnesses for the defense who testified positively that they were close to Paurez immediately before and during the fight and did not hear him say anything during the attack on Cobb. If it be true, as testified to by seven witnesses for the State, that Paurez said something in a foreign language while standing near the door and as Cobb and Fox were going toward the door, we do not think the conclusion necessarily follows from that proof that he directed the crowd to attack Cobb. So far as this record discloses, the words spoken may have amounted to a direction to the miners about him not to start any trouble or an attack on Cobb or any of his associates. The record is absolutely barren of any evidence that Paurez attempted to attack Cobb or encouraged or aided any attack on him, except the bare statement of the seven witnesses that he said something in a foreign language, and Cobb's statement that he said, "Shut the door!" This latter expression is accompanied by no other statement showing that he meant thereby that the door be closed so that Cobb could not get out and so that they could beat him up or kill him. When the meeting first adjourned that night the crowd commenced going down rapidly and the stairway was very much crowded. If Paurez did say, "Shut the door!" his meaning is just as susceptible of the interpretation that he made the exclamation to keep a number of miners from returning and engaging in the fight as that he intended the door to be closed to prevent Cobb and his associates from escaping a beating.

As to the other four defendants, the evidence for the People, when considered alone, clearly warranted the jury in finding that those defendants were guilty beyond all reasonable doubt. The testimony for the People is to the effect that every one of those defendants attacked and struck Cobb or attempted to strike him, and that they uttered exclamations to the other miners directing and urging them to attack and kill him. Any defendant who uttered such

exclamations is clearly guilty of an assault with intent to murder, as the law is that he who aids and assists, advises or encourages, another to assault an individual with intent to kill and murder him is as guilty as the principals in the crime and is subject to the same punishment as those who followed such directions with intent to carry out the orders or directions. It is argued that there is very little evidence against Maliski and some of the others that they assaulted Cobb with intent to kill and murder him or that Maliski directed the same to be done by those who were attacking Cobb. Cobb was the only witness who testified that Maliski was attempting to assault and beat him. It is to be remembered that if Cobb's testimony is true Maliski was attempting to assault and beat Cobb under the directions of those defendants who were shouting such directions to him and the others as, "Shut the door and don't let him out!" "Kill him!" "Don't let him out!" The jury were warranted in believing that the men who gave such directions to those assaulting Cobb intended that his assailants should kill and murder him, and to further believe that the assailants were intending to carry out the instructions to kill and murder Cobb. Maliski not only attempted to assault and beat Cobb, but while doing so himself exclaimed, according to Hicks' testimony, "Hang them! Let's get a rope and hang them!" These expressions show clearly, if he made them, that his intention in assaulting and beating Cobb was, in fact, to carry out the order of the other aiders and abettors to kill him. The four boys testifying in behalf of Maliski do not agree as to the occurrences testified to by them. Their testimony is not convincing that Maliski was not in the hall at the time the attack on Cobb was begun, or, if he was not, that he did not return to the hall after the fight was started.

It is certain that somebody attacked Cobb and that they intended to kill and murder him or do him great bodily harm, and that is not disputed. Stress is laid on the fact

that all of the fourteen witnesses for the State did not see all of the things which occurred that night in that fight, and that some of them only saw one or two defendants strike or attempt to strike Cobb and only heard one or two defendants direct an attack against him, while as to some of the defendants there were several witnesses for the State who saw them engaging in the fight and heard them making vicious exclamations against him. There were two fights going on in the hall, and part of the time both of the fights were going on at the same time. The hall was literally full of miners, and when the rush was made on Cobb it was a natural consequence that no one man could see all that was done or hear all that was said that night. In passing on this case we must give more weight to the witnesses who testified to positive facts and as to the actual things they saw and heard, than to the negative testimony of those witnesses who stated that they did not see and hear what others positively testified they did see and hear. The positive witnesses are not to be discredited by the mere fact that somebody else did not see the same things which they saw or hear the same things they heard. The alibi witnesses for the several defendants did not agree in their testimony as to where the several defendants were while the fighting was in progress, and we think that it was peculiarly a question for the jury to pass on and settle the question of guilt or innocence of the four defendants aforesaid, and that we would be invading the province of the jury to do otherwise than to confirm the finding of the jury as to those defendants.

It is contended by defendants that the court erred in denying the application of each of them for a separate trial. The general rule is that parties indicted jointly are to be tried together. On all such applications a separate trial is addressed to the sound discretion of the court, and its refusal to grant such a trial will not constitute ground for reversal unless it appears in the record that there was an

abuse of such discretion. (*People* v. *Covitz*, 262 Ill. 514; *People* v. *Gukousky*, 250 id. 231.) When the applications for separate trials were presented to the court there appeared to be no reason for granting separate trials except the bare fact that there were thirteen defendants jointly indicted. The charge in the indictment against the defendants is simply an assault with intent to murder, and the record does not disclose that any complicated issues or questions were presented to the jury. The record does not disclose, so far as we are able to see, that any of the defendants were prejudiced because of the fact that they were not granted separate trials. This is particularly true as to the four defendants against whom the judgment of the lower court is affirmed.

We do not think the court committed reversible error in its rulings on the evidence. Counsel for the State was permitted to bring out the fact that some of the defendants and some of their witnesses were foreigners or of foreign birth and that some of them were not naturalized citizens. The fact that the defendants and some of their witnesses were foreigners or of foreign birth was one that could not well be concealed from the jury. Their language and their names so indicated. It was unnecessary for the State to show that any of them were not naturalized citizens. The proof of such fact merely amounted to proving an immaterial fact. Technically this was error, but it was harmless error. The State's counsel were very careful to impress the jury with the fact that it was their duty to give a foreigner or one of foreign birth the same fair and impartial trial as is accorded to an American citizen, and that it was their duty to consider the testimony of a foreigner or of a foreign-born witness in the same fair and impartial manner as that of citizens born in this country. Some of the defendants tried and convicted were American-born citizens, some of them were foreigners or of foreign birth, and some of those acquitted were foreigners or of foreign

birth. There is no indication in the record that any of the defendants were prejudiced by reason of the fact that they were foreigners or of foreign birth.

Complaint is made of some of the instructions given to the jury on behalf of the People. An examination of them reveals the fact that a few of them are faulty, but it also appears from a consideration of all the instructions that the law of the case was fully stated to the jury and that there was no reversible error committed in the giving of instructions. It was not the contention in this case that the defendants made an assault on Cobb with intent to murder him by poisoning, drowning, strangling or suffocating. The defendants were not on trial for any offense except that of an assault with intent to commit murder. It was therefore not necessary for the jury to be told what the penalty was for rape, mayhem, robbery, larceny, or any felony other than the one for which the defendants were tried. It was not claimed by the People or charged by them that any person who was not present in the hall on the night the offense charged was committed had advised or encouraged the commission of that crime. It was therefore error in the court to undertake to tell the jury that any person who was not present but had advised or encouraged the commission of the crime was guilty as a principal, etc. In other words, instructions should be given by the court that are confined to the facts and to the law of the particular case in hand, and a jury should not be confused by stating principles of law to them that are not applicable to and have nothing to do with the case.

Instruction No. 14 given for the People is objected to because it contains the statement of a mere abstract proposition of law without any direct application of it to the facts in this case. The objection is well founded. This court has repeatedly held that purely abstract propositions of law should not be submitted to the jury. The instruction is to the effect that malice is not confined to ill-will

327—22

toward an individual but is intended to denote an action flowing from any wicked mind, where the facts have been attended with such circumstances as evince plain indication of a heart regardless of social duty and fatally bent on mischief, and hence malice is implied from any deliberate and cruel act against another, however sudden, which shows an abandoned and malignant heart. That instruction has often been given and in some instances has been approved by this court as stating correct principles of law on the subject of malice. The vice of giving abstract propositions of law as instructions to a jury is, that the jury are too liable to arrive at the conclusion that the court thinks that the facts stated in such an instruction on which the proposition of law is based have been proved, while the law is that the jury should be required to make the proper finding on such facts. The above instruction, after defining malice, should have concluded substantially in this manner: and if the jury find from the evidence, beyond a reasonable doubt, that the defendants in this case committed a deliberate and cruel assault on the prosecuting witness, Cobb, however sudden, which showed an abandoned and malignant heart on their part, then the jury would be warranted in finding that they committed such assault with malice, within the meaning of the law. We do not think that the four defendants whose conviction is affirmed by us were prejudiced by the giving of this instruction. All defendants who participated in the assault on Cobb were guilty of a willful and malicious assault, and the jury were warranted in finding that all the defendants who participated in such assault committed the assault with intent to kill and murder Cobb, and that these four defendants were shown, beyond a reasonable doubt, to have participated in the assault.

There are other instructions which are faulty, but certainly enough has been said to prevent, on another trial of the three remaining defendants and in the trial of other

cases, the common fault of courts giving instructions to juries that do not apply to the particular facts in the case on trial and instructions that merely state purely abstract propositions of law.

For the foregoing reasons the judgment of the circuit court is affirmed as to the four defendants, Henry Corbishly, Ignatz Simmich, Steve Meanovich and Eddie Maliski, but reversed as to the other defendants, and the cause is remanded for further proceedings consistent with this opinion.

*Affirmed in part and in part reversed and remanded.*