## BERRY v. STATE

(No. 1920; March 9, 1937; 65 Pac. (2d) 1097)

For the plaintiff in error, the cause was submitted on the brief of *Wm. B. Cobb* of Casper, Wyoming.

For the defendant in error, the cause was submitted on the brief of *Ray E. Lee,* Attorney General; *Thomas F. Shea,* Deputy Attorney General; and *Wm. C. Snow,* Assistant Attorney General, all of Cheyenne.

RINER, Justice.

Leo Berry and Albert Berry, by an information filed May 17, 1934, in the district court of Natrona County, were jointly charged with committing the crime of assault and battery, with felonious intent, upon the person of one Howard Burgess, on the 3rd day of that month, in Natrona County, Wyoming. Both defendants were convicted and judgments and sentences were entered against each. Leo Berry filed no brief in this

court, and, as we are advised, has acquiesced in the judgment affecting him. Albert Berry, however, through these proceedings in error, insists that his conviction was erroneous.

The material facts to be considered are in substance these: Sometime prior to May 3, 1934, the Berry family consisted of Albert, the husband, Emma L., his wife, and two sons, Leo and Freddie. Leo apparently had attained his majority, but Freddie was only eight years old at the time of the events subsequently to be narrated. Albert and Emma were at that time divorced and each had remarried, Albert's second wife being Lillian M. The elder son remained with his father and stepmother, while the younger lived with his mother, who on the date last mentioned had gone to Harrison, Nebraska, and early that morning was married to Howard Burgess, referred to in the information aforesaid.

It appears that Albert, Lillian and Leo Berry were then living at what is designated in the record as the Strawn cabin, some twenty-two miles out on the Alcova road from the city of Casper, toward Independence Rock, and about a mile off the highway, while Emma L. Burgess, Howard Burgess and the boy, Freddie, after the trip to Harrison returned to Mrs. Burgess' homestead, which was situated about two miles southeasterly from said Rock. On this return trip, Burgess and his wife stopped at the home of a friend to pick up the boy, Freddie, and two small guns, a .410 shotgun and a .22 rifle, which were taken into the car both unloaded, as well as some saddles, which had been theretofore left there. These articles had been placed in the care of this friend "because," as Mrs. Burgess testified, "every time we left the house somebody would take something."

Sometime prior to May 3rd, Emma L. Berry had gone to Casper and caused the issuance of a criminal

warrant for the arrest of her former husband, Albert Berry, and her son, Leo, the charge being for the alleged theft of certain personal property which she had had in storage. In response to a message from the sheriff of Natrona County, Leo Berry and his stepmother came to Casper on May 3, 1934, and procured bail for his release from arrest. They then returned to the Strawn cabin, where Leo procured a gun, a .32 Special Colts revolver owned by his stepmother. They had supper, and then, with Albert Berry, drove to Alcova. Leo testified they went to see his mother to try to settle the difficulty arising in connection with the issuance of the warrant above mentioned. After making inquiries at Alcova, they continued on towards the homestead to which Howard Burgess and his wife and her child were returning, arriving in due time at what is designated in the testimony as the "second gate" to this property. It was then after dark and towards nine o'clock in the evening. The Berrys backed their car into a side road out of sight of this gate and turned off the car lights. They waited there some fifteen or twenty minutes until the Burgess car drove up to the gate.

Mrs. Burgess thereupon left the car to open the gate, which was fastened with a chain and padlock, and while she was attempting to do this, both Albert Berry and his son, Leo, came up to the vehicle, the former from the left side and the latter from some tall sagebrush on the right. Mrs. Burgess testified she then heard Albert Berry shout, "Stick them up, you son of a bitch, we have got you dead to rights. Don't move out of that light, stand there." Leo Berry thereupon opened the door of the automobile which Howard Burgess was driving, and without warning, making use of the Colts revolver aforesaid, shot him in the cheek and neck, the bullet lodging in the muscles of the back of the neck just below the skull. At the time of the trial

it had not been extracted. The boy, Freddie, was sitting on the seat next to his stepfather, and the shooting was done over his head and in such close proximity to Howard Burgess' face that it was burned by the flash of the powder from the gun's discharge. At the same time, or immediately following, Albert Berry broke out the car window on the left side of the vehicle next to Burgess, and commenced striking him and hitting him with a ballpein hammer, meanwhile calling out to Leo Berry, his son, to, 'Pour it on! Pour it on! Get the pocketbook."

The boy, Freddie, seems to have then been pulled from the car by his brother, Leo. Lillian Berry called out to her husband, "Leave Howard alone. Leo will take care of him; this woman is the one who caused this trouble." Whereupon Albert Berry assaulted his former wife, the then Mrs. Burgess, knocked her down several times, broke the bones of her nose and inflicted many bruises on her face and other parts of her body. While this was being done, Leo held his gun trained upon Burgess, and was told by Albert Berry to, "Watch him! Watch him now!" The boy, Freddie, endeavored to dissuade his father from injuring his mother, but was unsuccessful in his efforts. Albert Berry shouted, "We are going to dry-gulch him and throw rocks on him and deal him misery before we do it," and directed his wife, Lillian, to "take this woman away while we do up this job." Albert Berry also said to Leo while they were there at the second gate, and also subsequently while at the Strawn cabin later that night, as Mrs. Burgess testified, "I am proud of you; you did what I told you to; you are sure a chip off of the old block."

The unloaded .410 shotgun had been placed in the car underneath the forward seats, which were of the sort which are necessary to be raised in order to allow the occupants of the rear seat to get out when either

the right or left door of the vehicle was opened. They are referred to in the record as "jump seats." Leo discovered this gun, pulled it out and threw it on the ground. Burgess testifies that he himself did not touch it during the trouble. The deputy sheriff, who later picked it up, testifies that it was unloaded, as did also the boy, Freddie.

During the altercation, Burgess, testifying as a witness for the State, said that Albert Berry asserted, "We will demand a hundred dollars; write out a bill of sale for those horses right now; everything that is on the place we will demand," and that they (referring to Leo and Albert Berry) said "they was going to hold her (Mrs. Burgess) until she paid them or gave them a bill of sale for the horses." Mrs. Burgess testified concerning Albert Berry, "Every time I tried to get up he hit me. He says, 'I want everything in the cabin; want everything else.' Calling all kind of names, said, 'What did you sell that house for?' I sold that to Miles. He said, 'I came down to move into it. Have you got the money?' I says, 'No.' He says, 'We came down to collect. We are going to get it.'"

Afterwards, Howard Burgess and his wife and Freddie were taken in the Berry car about thirty miles to the Strawn cabin. When Burgess asked Leo to take him to town for medical attention, as he was bleeding badly, he at first refused, and Albert Berry said, "No, don't take him. They are due for a ride anyhow. The best thing for them is to finish the job up and dry gulch them." Later Burgess promised that he would say that the injuries he had received were the result of an accident; whereupon Leo took him to the Casper hospital. When first questioned by the nurse there, in Leo's presence, Burgess stated the injuries were due to an accident, but subsequently, when asked about the matter by the Natrona County sheriff, detailed the facts as related above. Mrs. Burgess and Freddie were kept

at the Strawn cabin, without medical attention, until the next day, when they, too, were brought to Casper, and Mrs. Burgess was placed in the hospital there.

On May 4, 1934, the Natrona County sheriff and his deputies came to the Strawn cabin for the purpose of arresting Albert and Leo Berry. These men at once fled, but were apprehended, Leo shortly thereafter, and Albert after a two hour search. The foregoing delineates the substance of the evidence on behalf of the State.

The evidence on behalf of the defendants, given by Albert Berry, his wife, and his son, Leo, was to the effect that an altercation took place at the second gate leading to the homestead aforesaid. The father, Albert Berry, and his son, Leo, stated in their testimony that when Leo Berry opened the door of the Burgess car, Burgess immediately produced and pointed the .410 shotgun at the former, and in the scuffle, Leo Berry took his revolver and shot Burgess by accident in the course of a struggle over the shotgun and in defense of his (Leo Berry's) person and to repel the assault of Burgess. There was testimony also given by both these men that Mrs. Burgess struck Leo with the lock and chain off the gate post. In rebuttal, evidence was introduced by the State to establish that the chain was fastened to the post by a wire staple and could not be removed by hand, and that the boy, Freddie, unfastened the lock after the altercation was over and put the lock in his pocket.

It is contended on behalf of Albert Berry that the jury could not properly reach the conclusion that he intended to kill Howard Burgess and that the evidence in the case did not warrant any such verdict as was rendered against him. Section 32-207 W. R. S., 1931, provides.

"Whoever perpetrates an assault, or assault and battery, upon any human being with intent to commit a

felony, shall be imprisoned in the penitentiary not more than fourteen years."

And Section 32-1101 reads:

"Every person who shall aid or abet in the commission of any felony, or who shall counsel, encourage, hire, command, or otherwise procure such felony to be committed, shall be deemed accessory before the fact, and may be indicted, informed against, tried and convicted in the same manner as if he were a principal, and either before or after the principal offender is convicted or indicted or informed against; and upon such conviction he shall suffer the same punishment and penalties as are prescribed by law for the punishment of the principal."

Mr. Bishop in 3 New Criminal Procedure, 1221-2, Section 4, says:

"The statutes in some of our States, by their terms or by construction, make the accessory before the fact in felony a principal; thus, he 'shall be deemed and considered as principal, and punished accordingly.' Under which provision, the proof against one charged as principal may be that he was an accessory before the fact."

Speaking of a statute resembling our Section 32-1101, supra, the court in the recent case of Hunter v. State, ——Ariz.——, 55 Pac. 2d) 310, remarked:

"We feel that the better rule is that proof that a defendant, who is indicted or informed against as a principal, was an accessory before the fact fully sustains the allegations of the indictment or information, and that there is no variance."

We find that 16 C. J. 133, upon the authority of many decisions of the courts of review of the Union, states the rule to be:

"The presence of one at the commission of a felony by another is evidence to be considered in determining whether or not he was guilty of aiding and abetting. And it has also been held that presence, companionship,

and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred."

In line with the statement of the text just quoted is what was said by this court in Bryant v. State, 7 Wyo. 311, 51 Pac. 879, 56 Pac. 596, on petition for rehearing, where referring to the case of Roberts v. People, 19 Mich. 401, this language was employed:

"That court, however, in the same case held further that it was unnecessary to prove the specific intent by direct, positive, and independent evidence; but as the court remarked by quoting from one of its own earlier decisions 'the jury may draw the inference, as they draw all other inferences from any facts in evidence which, to their minds, fairly prove its existence,' and then added, 'and in considering the question they may and should take into consideration the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations, prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made.' "

In the case at bar there was clear evidence from which the jury might infer that Albert Berry was present, not only aiding and abetting in the shooting of Howard Burgess, i. e., through commanding him to "stick them up," thus endeavoring to prevent Burgess from defending himself, but also, there is evidence that he told Leo Berry, before the shooting, to do exactly as he did. It is difficult to conceive of a stronger case indicating an intent on Albert Berry's part to do the unlawful act charged against him. When, as indicated in the Bryant case, supra, all the facts and circumstances surrounding the occurrence and Albert Berry's declarations "prior to, at the time and after the assault" are considered, the jury was authorized to find

beyond all reasonable doubt that the father intended his son, Leo, to shoot Burgess, with intent to kill him. It was the merest chance that Burgess was not slain by the bullet from Leo Berry's gun and which he still carried in his neck at the time of the trial.

Said the court in People v. Corbishly, 327 Ill. 312, 158 N. E. 732:

"As to the other four defendants, the evidence for the people, when considered alone, clearly warranted the jury in finding that those defendants were guilty beyond all reasonable doubt. The testimony for the people is to the effect that every one of those defendants attacked and struck Cobb or attempted to strike him, and that they uttered exclamations to the other miners directing and urging them to attack and kill him. Any defendant who uttered such exclamations is clearly guilty of an assault with intent to murder, as the law is that he who aids and assists, advises or encourages, another to assault an individual with intent to kill and murder him is as guilty as the principals in the crime and is subject to the same punishment as those who followed such directions with intent to carry out the orders or directions."

In Brown v. Commonwealth, 130 Va. 733, 107 S. E. 809, 16 A. L. R. 1039, where the defendant, with two others, went to the house of the prosecuting witness, with an intention to fight him if he found he had been treated unjustly by said witness, and the defendant did not know that one of his companions was armed, and where during the fight that followed, the latter shot said witness, it was held that the defendant was guilty as a principal of unlawfully and feloniously shooting the injured man, with intent to kill him, even though prior to the fight neither the defendant nor his companions had any intention of doing any shooting. The court pointed out that:

"It may be conceded that there is no sufficient evidence to show that it was a part of the original plan or design of these parties to shoot White. Such a con-

cession does not avail anything to the defendant. What actually occurred was not an improbable consequence of the fight which they clearly intended to provoke. When two or more persons go to the home of a third party to whip him, they know he will in all reasonable probability use force in resisting the attack, and that bloodshed is likely to result on one or both sides.

"In 1 Wharton's Criminal Law (11th Ed.) § 258, pp. 329, 330, it is said:

" 'All those who assemble themselves together with an intent to commit a wrongful act, the execution whereof makes probable, in the nature of things, a crime not specifically designed, but incidental to that which was the object of the confederacy, are responsible for such incidental crime. * * * Hence, it is not necessary that the crime should be a part of the original design; it is enough if it be one of the incidental probable consequences of the execution of that design, and should appear at the moment to one of the participants to be expedient for the common purpose.' "

See also Anderson v. State, 171 Miss. 41, 156 So. 645; Lacy v. State, 177 Ark. 1056, 9 S. W. (2d) 314.

There is evidence in the record before us from which the jury could readily conclude that Albert Berry and Leo, his son, intended to carry out an unlawful purpose and to provoke trouble. According to the State's case, they apparently wanted the money Mrs. Burgess had obtained from the sale of property, or the property itself, and adopted the violent procedure they employed in an endeavor to get it.

Complaint is made that the district court declined to give defendants' Instruction No. 13. That instruction reads:

"The court charges the jury that even if you find from the evidence that defendant Albert Berry and the co-defendant, Leo Berry, acted illegally and maliciously in what they did, with the same end in view, yet, unless you are satisfied from the evidence beyond a reasonable doubt, and to a moral certainty, that defendant, Albert Berry, aided and abetted whoever did shoot at the com-

plaining witness, Howard Burgess; and if you have a reasonable doubt of defendant Albert Berry's guilt, under the rules above stated, you should acquit him."

Upon examination of this language, it is apparent that the first portion of the instruction is incomplete, no direction being given the jury as to the legal consequences which would follow if they should make the indicated findings. This portion is also confusing and misleading through the use of the words "acted illegally and maliciously in what they did, with the same end in view," for if Albert Berry and Leo Berry did so act, and the end they had in view was to kill Howard Burgess, then certainly they would be guilty of the crime charged against them.

Instruction No. 19 asked by the defendants was refused by the court, and complaint is made that it should have properly been given. It in part read: "Should you believe from all the evidence, that one of the defendants did commit such assault and inflict such injury with intent to kill and murder and that the other of said defendants either did not participate in the act or did not harbor such malicious intent, then and in that case you may and should by your verdict find one of the defendants guilty and find the other innocent and so declare by your verdict." This language was misleading, as it probably would have induced the jury to have believed that to render Albert Berry guilty he must have taken part in the actual act of shooting Howard Burgess. That is not the law as we have seen.

It is said that defendants' Instructions Numbers 3, 6 and 8 should have been given to the jury. These all deal with the question whether the shot fired from Leo Berry's revolver was fired through accident. This matter was sufficiently covered by the trial court's Instruction No. 9, and the defendants' theory as to the conclusions to be drawn from the evidence on that point was clearly submitted for the jury's consideration. That

body evidently rejected defendants' theory in this respect, and, as we read the record, we consider that there was sufficient evidence to authorize them to do that if they saw fit. It is obvious that if the jury had found that the shooting was merely accidental, both defendants would necessarily have been acquitted. This consequence follows from the very nature of the charge against them. In this connection we may well express a doubt whether, under the circumstances of this case, the defense of accidental shooting was open to the defendants.

On behalf of the plaintiff in error, it is stated: "The only way in which the conviction of the defendant, Albert Berry, can be upheld is in assuming that he countenanced, concurred in, aided and abetted the defendant, Leo Berry's, actions in assaulting and shooting the complaining witness." We cannot agree, however, with the statement immediately following these words, that no actions of the defendant, Albert Berry, were proven from which the jury could rightfully conclude that he intended to kill and murder the complaining witness. On the contrary, we think there was ample evidence—some of which has heretofore been outlined —which would permit the jury to find, as it seems to us it did, that Albert Berry deliberately aided and abetted his son, Leo, in assaulting and inflicting the gunshot wound on Howard Burgess, with intent to kill the latter. 3 Bishop's New Criminal Procedure, 1260, Section 61, is cited. We are unable to see how the material set forth there affects this case, it having to do merely with assaults by two persons on each other.

It is finally urged against the judgment sought to be reversed that associate counsel who conducted the cross-examination of the State's witnesses was so under the influence of liquor that he failed in the proper performance of his duty, and that in consequence the plaintiff in error did not receive a fair trial. The record

shows that the evidence on behalf of the defendants was entirely presented by another attorney. This record will be searched in vain for any action on the part of any one at the trial to call such a condition of affairs to the attention of the trial court. If counsel's physical condition was as evident as the affidavits filed months after the time for filing a motion for a new trial would seem to indicate, the matter should have been presented to the court by the other attorney in the case before the defendants' evidence was tendered, certainly before the trial closed. Further, we have no doubt, knowing as we do the ability of the judge who presided when this case was tried, that if counsel's mental delinquency had been so manifest, or, if not clearly apparent, had nevertheless been called to the notice of the judge, the matter would have received instant and proper disposition. Our careful perusal of the cross-examinations of the several witnesses for the State, as reproduced by the official stenographer, discloses nothing from which it could be reasonably concluded that counsel was not performing his duty as one in full possession of his faculties.

Having disposed of all the points urged for a reversal of the judgment below which we deem necessary for consideration at our hands adversely to the plaintiff in error, Albert Berry, the judgment against him should be affirmed.

*Affirmed.*

BLUME, Ch. J., and KIMBALL, J., concur.