402

The People of the State of Illinois, Defendant in Error,
v. Julius P. Waitches, Plaintiff in Error.

Gen. No. 39,032.

Denis E. Sullivan, P. J., dissenting.

Opinion

filed May 19, 1937.  Rehearing denied June 2, 1937.

Ode L. Rankin, of Chicago, for plaintiff in error.

Thomas J. Courtney, State's Attorney, for defendant in error; Edward E. Wilson, John T. Gallagher, Richard H. Devine and Melvin S. Rembe, Assistant State's Attorneys, of counsel.

Mr. Justice Hall delivered the opinion of the court.

On December 31, 1935, defendant was found guilty of the crime of conspiracy, and sentenced to the penitentiary for an indeterminate period of not less than one nor more than five years, and to pay a fine of $1. By this writ of error, he seeks to have the judgment reversed.

Defendant, together with Bella Butman, John J. Bagdonas, Nick Radis, Paul Zalink, John Dailyde and Thomas Butman, was indicted on a charge of conspiring to do an act injurious to the administration of public justice by forging, uttering, presenting and proving a purported will of James Thomas Kelly, deceased, and to unjustly obtain property of the estate of James Thomas Kelly, deceased, by forging, uttering and probating such will. As originally returned, the indictment contained 14 counts. Prior to the trial, counts 1, 2, 3 and 4, which charged forgery, and counts 9, 10, 11 and 12, which charged conspiracy, were dismissed. The cause was tried on counts 5, 6, 7, 8, 13 and 14. Counts 5 and 6, each, in substantially the same terms, charge a conspiracy to falsely make, forge and counterfeit a will purporting to be the last will and testament of James Thomas Kelly, deceased, with intent to prejudice, damage and defraud the estate of James Thomas Kelly, deceased. Counts 7 and 8, each, in substantially the same terms, charge a conspiracy to utter, publish and file in the probate court of Cook county, a false, forged and counterfeited will and testament of James Thomas Kelly, deceased, with intent

to defraud the estate of James Thomas Kelly, deceased. Count 13 charges a conspiracy to corruptly do an illegal act, injurious to the administration of public justice by obtaining possession, control and ownership, and to deprive its lawful owners and rightful recipients of a large amount of money, real and personal estate, belonging to James Thomas Kelly, deceased, at the time of his death, by forging and counterfeiting a false and fraudulent will and testament purporting to be the last will and testament of James Thomas Kelly, deceased, with intent to thereby prejudice, damage and defraud any persons, any body politic and any body corporate that would be lawfully entitled to receive the money and property belonging to such estate, and by uttering and publishing the counterfeited will and testament, and filing the same in the probate court of Cook county, knowing it to be forged and counterfeited, intending to damage and defraud any person, body politic and any body corporate .that would be entitled to the same. Count 14 charges that the defendant conspired to unjustly obtain possession, control and ownership, and to deprive its lawful and rightful recipients of a large amount of money, real and personal estate belonging to James Thomas Kelly, deceased, at the time of his death, by forging and counterfeiting a false and fraudulent will and testament, purporting to be the last will and testament of James Thomas Kelly, deceased, with intent to thereby prejudice, damage and defraud any persons, any body politic and any body corporate that would be lawfully entitled to receive the money and property of such estate, and by uttering and publishing such forged and counterfeited will and testament, and by filing the same in the probate court of Cook county, knowing it to be forged and counterfeited, and intending thereby to damage and defraud the persons

mentioned. In the last mentioned counts, it is also charged that through such conspiracy, the defendants caused the forged and alleged counterfeited will to be proved and allowed and admitted to probate in the probate court of Cook county, by false and perjured testimony, tending to prove the alleged will to be true and genuine, and by suborning the unlawful, wilful, corrupt and false oaths of witnesses on the hearing of the petition to probate the will, and by offering perjured testimony at such hearing, knowing the same to be false.

A motion in writing was made to quash the indictment upon the ground that it was insufficient because it failed to disclose the names of the persons, body politic or body corporate, whom or which the defendant was guilty of having damaged or defrauded, and that the indictment in each count fails to disclose and describe the property and the value thereof, of which the defendants are charged with having defrauded the estate of James Thomas Kelly, deceased. Also, that the counts remaining in the declaration are insufficient under the statute of the State of Illinois. As to the last point, the written motion to quash the indictment fails to particularize as to what is meant by "insufficient."

From the brief of defendant, we conclude that the principal point urged and relied upon in his motion to quash, is that the charge that the acts which defendant is alleged to have committed, and to thereby defraud "the estate of James Thomas Kelly, deceased," is not sufficient because "the estate of James Thomas Kelly, deceased," is neither a natural person nor a legal entity, and that, if the persons against whom the charges alleged to have been committed, are unknown, such facts should be stated in the indictment. *People v. Brander,* 244 Ill. 26, and *People v. Picard,* 284 Ill.

588, are cited as authority for the defendant's contention. In *People v. Krittenbrink*, 269 Ill. 244, the defendant was charged with receiving a quantity of stolen drugs from Parke, Davis & Company, the owner of the property. The court held that the proof to sustain a conviction was insufficient because there was no evidence offered that Parke, Davis & Company was a corporation, as alleged in the indictment. In *People v. Brander, supra,* it was charged that defendant, as agent and clerk in the employment of "American Express Company, an association," was guilty of embezzlement of goods, money and property from such company, and in holding that a conviction under such indictment could not be sustained, the court said:

"As the indictment does not allege that the American Express Company is a joint stock company, the usual attributes of that sort of company are not to be implied, and the statements of counsel add nothing to the averments of the indictment. If the company owes its existence to the statute of any State and is such an entity as may own property by the name of 'American Express Company,' the facts should have been alleged." It is insisted that these cases are decisive of the point raised here. To the contrary is the case of *Billings v. State,* 107 Ind. 54, where it was charged that after the death of a decedent, the defendant forged a note and filed it as a claim against an estate. He was charged with having done so for the purpose of defrauding "the estate of Louis C. Morgan." In sustaining the indictment and the conviction of the defendant charged with the crime, and where the same question in effect was raised as is raised here, to wit: that the indictment did not charge the defendant with intent to defraud any person, that court said:

"This intention cannot prevail. The estate of a decedent is a person in legal contemplation. 'The

word "person," ' says Mr. Abbott, 'in its legal signification, is a generic term, and includes artificial as well as natural persons.' 2 Abb. Law Dict. 271; *Douglass v. Pacific, etc., Co.*, 4 Cal. 304; *Planters, etc., Bank v. Andrews*, 8 Port. (Ala.) 404. It is said in another work that 'persons are of two kinds: natural and artificial. A natural person is a human being. Artificial persons include (1) a collection or succession of natural persons forming a corporation; (2) a collection of property to which the law attributes the capacity of having rights and duties. The latter class of artificial persons is only recognized to a limited extent in our law; examples are—the estate of a bankrupt or deceased person.'· 2 Rapalje & L. Law Dict. 954. Our own cases inferentially recognize the correctness of the definition given by the authors from whom we have quoted, for they declare that it is sufficient, in pleading a claim against a decedent's estate, to designate the defendant as the estate of the deceased person, naming him. *Ginn v. Collins*, 43 Ind. 271. Unless we accept this definition as correct, there would be a failure of justice in cases where, as here, the forgery is committed after the death of the person whose name is forged; and this is a result to be avoided if it can be done consistent with principle. We perceive no difficulty in avoiding such a result; for, to our minds, it seems reasonable that the estate of a decedent should be regarded as an artificial person. It is the creation of law for the purpose of enabling a disposition of the assets to be properly made, and, although natural persons as heirs, devisees, or creditors, have an interest in the property, the artificial creature is a distinct legal entity. The interest which natural persons have in it is not complete until there has been a due administration; and one who forges the name of the decedent to an instrument purporting to be a promissory note must

be regarded as having intended to defraud the estate of the decedent, and not the natural persons having diverse interests in it, since he cannot be presumed to have known who those persons were, or what was the nature of their respective interests. The fraudulent intent is against the artificial person, the estate, and not the natural persons who have direct or contingent interests in it.''

Bouvier's Law Dictionary, Vol. 1, page 1075, in its definition of the word ''estate,'' among other things, says: ''As the word is commonly used in the settlement of estates, it does include the debts as well as the assets of a bankrupt or decedent, all his obligation and resources being regarded as one entirety. See *Davis's Heirs v. Elkins,* 9 La. 135.'' As stated, the word ''estate'' as applied to the property of a deceased person is a generic term. Standard Dictionary defines ''estate'' as—''One's entire property or possession; collective assets above or against liabilities; especially property left after death.'' Illinois State Bar Stats. 1935, chapter 3, is entitled, ''Administration of Estates.'' This statute, among other things, provides for the filing of ''claims against estates.'' Section 4 of this act provides that ''the power of the executor over the testator's estate, before probate of the will and obtaining letters testamentary, shall extend to the burial of the deceased, the payment of necessary funeral charges, and the taking care of the estate, etc.'' Chapter 148, Illinois State Bar Stats. 1935, entitled, ''Wills,'' has a number of sections in which the word ''estate'' has a generic meaning. Section 1 of this chapter provides that ''every male person of the age of twenty-one years, and every female of the age of eighteen years, being of sound mind and memory, shall have power to devise all the estate, right, title and interest, in possession, reversion or remainder, which

he or she hath, or at the time of his or her death shall have, etc.''

One who is at all familiar with the probating of wills and the administration of estates, knows that it is usually impossible at the time of the probating of a will to ascertain with certainty just what person or persons might or might not have an interest in the estate of the deceased person, whether as heirs-at-law, creditors or otherwise. It is now, and always has been, the custom to entitle a cause in the probate court as ''In the matter of the estate'' of such person.

Par. 1 of chapter 39, Illinois State Bar Stats. 1935, entitled ''Descent''; Jones Ill. Stats. Ann. 110.193, provides that: ''. . . If the intestate leaves no kindred, and no widow or husband, his or her estate shall escheat to and vest in the county in which said real or personal estate, or the greater portion thereof, is situated.''

Section 6 of par. 6 of the Revenue Act, chapter 120, Illinois State Bar Stats. 1935; Jones Ill. Stats. Ann. 119.006, provides that:

''Personal property shall be listed [for taxation] in the following manner: . . . the property . . . of the estate of a deceased person, by the executor or administrator.''

In Wharton on Criminal Law, 10th Ed. Vol. 2, section 1396, it is said:

''Where, therefore, the persons injured were defined at the time of the conspiracy and ascertainable by the pleader, their names should be specified in the indictment. Where, however, the conspiracy was to defraud a class not capable of being at the time resolved into individuals, or to defraud the public generally, then the specification of names is impractical and unnecessary.''

In McLain on Criminal Law, Vol. 2, section 982, it is said:

"Where the charge is of a conspiracy to defraud in general it is not necessary to specifically allege the name of the person or persons intended to be defrauded. It is enough to charge the intent to defraud persons of a particular class or description."

Paragraph 261 of chapter 38, Illinois State Bar Stats. 1935; Jones Ill. Stats. Ann. 37.219, provides that:

"Every person who shall falsely make, alter, forge or counterfeit any record or other authentic matter of a public nature, or any charter, letters, patent, deed, lease, indenture, writing, obligatory, will, testament, codicil annuity bond, covenant, post note, check, draft, bill of exchange, contract, promissory note, due bill for the payment of money or property, receipt for money or property, power of attorney, any Auditor's warrant for the payment of money at the treasury, county order, or any accountable receipt, or any order or warrant, or request for the payment of money or the delivery of goods or chattels of any kind, or for the delivery of any instrument of writing or acquittance, release or receipt for money or goods, or any acquittance, release or discharge for any debt, account, action, suit, demand or other thing, real or personal, or any transfer or assurance of money, stock, goods, chattels or other property whatever, or any letter of attorney or other power to receive money, or to receive or transfer stock or annuities, or to let, lease, dispose of, alien or convey any goods or chattels, lands or tenements, or other estate, real or personal, or any acceptance or indorsement of any bill of exchange, promissory note, draft or order, or assignment of any bond, writing obligatory or promissory note for money or other property, or any ticket or pass for the passage of any person upon any railroad or other conveyance, or for the admission of any person to any entertainment for which a consideration is required, or any

other written instrument of another, or purporting to be such, by which any pecuniary demand or obligation, or any right in any property is, or purports to be created, increased, conveyed, transferred, diminished or destroyed; or shall counterfeit or forge the seal or handwriting of another, with intent to damage or defraud any person, body politic or corporate, whether the said person, body politic or corporate reside in or belong to this State or not; or shall utter, publish, pass or attempt to pass as true and genuine, or cause to be uttered, published, passed, or attempted to be passed as true and genuine, any of the above named false, altered, forged or counterfeited matters, as above specified and described, knowing the same to be false, altered, forged or counterfeited, with intent to prejudice, damage or defraud any person, body politic or corporate, whether the said person, body corporate or politic reside in this State or not; every person so offending shall be deemed guilty of forgery, and shall be imprisoned in the penitentiary not less than one year nor more than fourteen years.''

In *Cole v. People,* 84 Ill. 216, the Supreme Court said:

''It will be observed the indictment charges the offense, substantially, in the language of the statute, that defendants 'unlawfuly, feloniously, wilfully and fraudulently did conspire and agree together, with the fraudulent intent wrongfully and wickedly to injure the administration of public justice, by then and there unlawfully, wilfully and fraudulently attempting to obtain and procure a decree of divorce,' in the Superior Court of Cook County, and that is all the law requires. By our laws every indictment or accusation of the grand jury shall be deemed sufficiently correct which states the offense in the terms and language of the Criminal Code, or so plainly that the nature of the offense may be easily understood.''

We are of the opinion that the indictment meets all the requirements of the law, that the defendant was fully and definitely apprised of the charge made against him in the language of the statute, and that the court was not in error in denying the motion to quash.

Waitches obtained a severance, and was tried alone.

Nick Radis, one of the persons indicted with Waitches, and who, prior to the time of the trial, had pleaded guilty to the charge of conspiracy, testified to the effect that he was acquainted with John Bagdonas, an undertaker; that the witness worked for Bagdonas as chauffeur and assistant, and that for his, the witness', services he was paid a commission on the amount paid the undertaker for funeral expenses; that he had known James Thomas Kelly during his lifetime; that on February 26, 1935, in the late afternoon or evening he, the witness, was in Bagdonas's establishment at 2506 West 63rd street, Chicago; that prior to that time he had received a call from Mrs. Bagdonas, in which she told the witness to go to 651 West Madison street, where someone had died; that the witness proceeded to this place and found Mrs. Butman there, and that he then communicated with John Bagdonas; that they then proceeded to 6743 Irving Park Boulevard, the residence of Mrs. Butman, at which place he arrived about 8:30 or 9 o'clock in the evening; that at that time the body of James Thomas Kelly was lying in bed, and that a Dr. Hurwitz there signed a death certificate; that after the death certificate was signed, the witness took the body of Kelly in his car to Bagdonas's undertaking establishment and placed the body in the embalming room and then left; that on February 27, 1935, the witness returned to the undertaking establishment at about 2 o'clock in the afternoon and found Bagdonas there; that Bagdonas talked over the telephone to the defendant Waitches, and that

Waitches came to the undertaking establishment a short time thereafter; that a short time after Waitches's arrival, he saw Bagdonas, Mrs. Butman, Tom Turie, Tom Butman and Waitches in the private office of the Bagdonas establishment, and that at that time, Waitches was sitting in a chair at the typewriter desk, and that Bagdonas was sitting near him; that Waitches held a blank form of will and asked for certain information about it from Mrs. Butman; that Waitches asked Mrs. Butman who signed the name of James Thomas Kelly—who had died the day before— to this will, and that Mrs. Butman explained to Waitches that the signature was that of James Thomas Kelly, that Kelly had left everything to her, Mrs. Butman, all the bank books, money and real estate, and that Kelly wanted Bagdonas to be the undertaker, for which services Bagdonas was to receive $4,500; that the first time he, the witness, saw the paper which purported to be the will of Kelly, it was in Waitches's hand, and that at that time, it did not have the signature of Paul V. Zelink or John Dailyde on the instrument. The purported will of James Thomas Kelly, which was offered for probate and introduced in evidence in this case, shows the signatures of Paul V. Zelink and John Dailyde thereon as witnesses. The State had theretofore offered in evidence two certain documents, one of which contained a row of figures which totaled $45,829.03, and the other which contained a memoranda as follows: ''Church $1,000, tombstone $1,000, funeral $1,000, attorney 6%, Radis, rem. (presumably remainder) to Butman,'' with a memorandum at the bottom to this effect: ''All of the foregoing being on piece of adding machine paper and in the handwriting of the defendant, J. P. Waitches.'' As to these documents, Radis testified, in substance, that Waitches wrote the figures thereon in green ink, at the time they were discussing the will. This witness also

testified that in the will as finally made up, he was named as executor, and that the witness at that time stated to Waitches that he had never had such a job as that of being executor, and that Waitches then explained to him that he, the witness, would have nothing much to do, as he, Waitches, together with Mrs. Butman, would take care of it, and that he, the witness, should be present in the probate court to represent the estate of Kelly, together with Mrs. Butman. Radis also testified to the effect that he there understood from Mrs. Butman that Bagdonas was to receive $4,500 for funeral expenses; that at the time of this conversation with Waitches and Mrs. Butman, Waitches had in his possession certain keys and eight bank books containing the name of Kelly, and that Waitches then and there typed the will, gave it to Mrs. Butman after it was completed, and that Waitches then said: "You've got to have two witnesses," and that Waitches then took his brief case and left. Radis further testified to the effect that at the time and place just referred to, all the parties were speaking in the Lithuanian language, and that he, being a Lithuanian, understood all that was said; that after the conversation and incidents related, he received the completed document purporting to be the will of Kelly, took it to Father Zelink, 2204 North Clark street, showed him the document, and said: "Mrs. Butman wants your signature on that," and that Zelink then signed the will as a witness and that at this time, the will was fully made out, except for the signatures of Zelink and Dailyde; that he Radis, then took it to Dailyde and said to him, "Mrs. Butman wants your signature on this document"; that he then took Dailyde to Mrs. Butman, and that Dailyde then signed his name to the document as a witness; that Dailyde saw the body of Kelly in the back chapel on the evening of February 28, 1935,

Radis also testified to the effect that he then delivered the will to Waitches at Waitches' office; that Zelink was present at that time, and was asked by Waitches if that was his signature, and Zelink replied that it was; that he, Radis, procured a petition for letters testamentary in the estate of Kelly from Waitches at his office on the first or second of March, 1935, and that Waitches told him that Mrs. Butman was supposed to sign the document; that he, the witness, then immediately went to Mrs. Butman and that she signed her name to it; that Waitches told the witness that the next day at 9:30 Mrs. Butman and the witness should go to the probate court, which they did, and that they there met Waitches, and that Waitches filed the purported will of Kelly, a memorandum of bank balances shown by the bank books, memorandum of provisions in the will, the keys and eight bank books in the name of Kelly, the agreement of Mrs. Butman to pay the funeral expenses, her agreement to pay executor's fees, together with the petition for the probating of the will; that they went before the assistant probate judge; that Mrs. Butman then took the witness stand and testified, and that shortly thereafter he and Mrs. Butman filed a petition in the probate court, signed by them, which petition prayed that the court allow Mrs. Butman, who also had been named executor in the will, to expend the sum of $4,500 in and about the preparation of the body of Kelly for burial, and the sum of $1,000 to cover services and mass in the Holy Catholic Church, of which Zelink was the pastor. Radis further testified that the petition just referred to, which he signed, was given to him by the defendant Waitches, and that Waitches told the witness to sign his name to it, which he did, and that Mrs. Butman also signed. (The petition bears the date of March 6th, 1935.) This

witness also testified that he had known Waitches since the year 1922. On cross-examination, Radis testified to the effect that before Waitches filled in the blank spaces on the typewriter, he saw Waitches making notes on a piece of paper; that he heard Mrs. Butman tell Waitches that Kelly, the deceased, had said, ''I leave everything to you, all my estate''; that at that time, Bagdonas said he was to have $4,500 for his services, and that the witness heard talk about attorney's fees, and that Bagdonas stated that the fees for attorneys were 5 or 6 per cent.

The petition filed by the defendant Waitches in the probate court, on March 6, 1935, referred to by the witness Radis, is in words and figures as follows:

''To the Honorable John F. O'Connell, Judge of said Court:

''The petition of Bella Butman and Nick Radis respectfully showeth that they are residents of said County, that on the 26th day of February, A. D. 1935, James Thomas Kelly, also known as James T. Kelly, and as Thomas Kelly, of Chicago, in said County, departed this life at Chicago leaving a last will and testament, duly signed and attested, as your petitioner believes, which they now present to your Honor for Probate. That said Testator in said will nominated your petitioners executors thereof.''

[Description of property in the estate.]

''That the value of the whole estate of said deceased does not exceed Fifty Thousand ($50,000.00) Dollars. That said deceased left him surviving:

''Names          Relationship          Residence
''No known heirs at law
   or next of kin
''Unknown heirs.
''his only heirs at law. That the names of residences of the legatees and Devisees under the will of said deceased are as follows:

"Bella Butman

"That the petitioners reside at 6743 Irving Park Blvd., and 10734 South Michigan Ave., and are willing to accept and undertake the trust confided to them in said will, wherefore your petitioners pray that said will may be admitted to probate, and letters testamentary thereon may be issued to them after proper hearing and proof, and that the hearing on said petition may be set for the ...... day of ......, A. D. 19.., at .... o'clock ...... M. or as soon thereafter as the matter can be heard, and that all other orders necessary may be made.

"Your petitioners further represent to your Honor that Victor T. Petkus, David G. Stone and Walter Koessler are persons of discretion, not related to the deceased nor interested in the administration of his estate and they respectfully recommend their appointment by the Court as appraisers.

"State of Illinois ⎱
   County of Cook ⎰ ss.

"Bella Butman and Nick Radis, being duly sworn say they have heard read the foregoing petition by them subscribed, and know the contents thereof, and that the same is true.

        "(signed)   Bella Butman
        (signed)   Nick Radis

"Subscribed and sworn to before me, Mitchell C. Robin, Clerk of the Probate Court of Cook County, this 6th day of March, A. D. 1935.

        "(signed)   Mitchell C. Robin,
                      Clerk.

"File No. 200316
Docket      342                     Page 568

PROBATE COURT OF COOK COUNTY

ESTATE OF JAMES THOMAS KELLY,
                       Deceased.

"Petition of Bella Butman and Nick Radis For Proof of Will and Letters Testamentary

Appraisers:
Victor T. Petkus
David G. Stone
Walter Koessler

J. P. Waitches

Lawyer
2 East 103rd Place
103rd Pl. & State St.
Pullman 5950   Chicago"

The following is a copy of the document offered for probate as the will of James Thomas Kelly:

"In The Name of God, Amen.

"I, James Thomas Kelly, of Chicago, in the County of Cook and State of Illinois, being of sound mind and memory, and considering the uncertainty of this frail and transitory life, do, therefore, make, ordain, publish and declare, this to be my last Will and Testament.

"First, I order and direct that my executors hereinafter named pay all my just debts and funeral expenses as soon after my decease as conveniently may be.

"Second.   After the payment of such funeral expenses and debts, I give, devise and bequeath to my esteemed friend Bella Butman of 6743 Irving Park Boulevard, Chicago, Illinois, all my estate, real, personal and mixed of every kind and description, of every kind and description and wheresoever situated, including all Bank accounts and all other assets, subject however, to the payment by the executors of this my will, out of my estate, of the following amounts to the following persons: To any Roman Catholic Church

parish to be named by said Bella Butman the sum of One Thousand Dollars for church services in and about my burial and for Holy Masses for my soul; One Thousand Dollars for a Tomb Stone; Forty Five Hundred Dollars to J. J. Bagdonas & Company for favors rendered to me personally and in full for all funeral charges; Six per centum of the total amount of my estate to J. P. Waitches in full for his services to be rendered by him in and about the administration of my estate, and if he shall refuse to act, then to any attorney rendering such service; and four per centum to Nick Radis, which person is to be one of the executors of this will for his services as such executor, and the entire remainder of my estate to said Bella Butman, my dearest friend, to the exclusion of any and all persons, to her exclusive use and benefit forever.

"Lastly, I make, constitute and appoint Bella Butman and Nick Radis to be executors of this, my last will and testament, hereby revoking all former Wills by me made, and they shall file their personal bonds, sureties thereon are hereby waived.

"In witness whereof, I have hereunto subscribed my name and affixed my seal, the 30th day of January, in the year of our Lord, One Thousand Nine Hundred and Thirty Five.

"(Signed) James Thomas Kelly (Seal)

"This instrument was, on the date of the date hereof, signed, published and declared by the said testator James Thomas Kelly to be his last Will and Testament, in the presence of us who at his request have subscribed our names hereto as witnesses, in his presence and in the presence of each other.

(Signed) Rev. Paul Zelink, residing at 2206 N. Clark St. (Signed) John Dailyde, residing at 1101 W. 101 Str.''

The outside of the will is labeled as follows: "Will of James T. Kelly, Deceased. Filed Mar. 6, 1935. Mitchell C. Robin, Clerk."

At the time the petition to probate the will was filed, a further petition was presented to the probate court by Bella Butman and Nick Radis, in which it is recited that James Thomas Kelly left a last will and testament wherein he specifically requested that certain sums be paid for burial expenses; that the assets of the estate amounted to a sum in excess of $46,000, as evidenced by savings account books in the First National Bank of Chicago, and in which they assert that the assets of the estate consist of considerably more cash and personal property yet to be disclosed, that the deceased left no immediate relatives, and they asked for an order authorizing them to expend the sum of $4,500 in the preparation of the body for burial, and the sum of $1,000 to cover the services and masses in the Holy Catholic Church. It is not denied that the will was presented and filed for probate, together with the petition, as claimed, nor that the representations were made to the probate court, as claimed, nor that all the incidents and conversations related by the witnesses took place, as narrated.

John Dailyde and Paul Zelink, who witnessed the will, both testified that the signatures on the claimed spurious will were theirs.

The defendant Waitches testified that he was born in Chicago, and was 42 years of age; that he was educated in Chicago and at Balford-Johnson Preparatory School, De Paul and Northwestern Universities; that he studied law at both De Paul and Northwestern, and that prior to that, he had had business experience; that he was married and had three children, and was admitted to the bar in the spring of 1919; that he worked as title examiner for the Chicago Title & Trust Company for about two years, and thereafter he began to practice law; that his practice was general, and that he had had considerable probate practice. He stated

that he knew Bagdonas and Radis, but that before February 27, 1935, he had not known Bella Butman; that on that date he went to the undertaking establishment of Bagdonas in response to a telephone call from the witness Radis, and arrived there about 2:30 or 3 o'clock in the afternoon; that when he arrived at this place, there were present Bagdonas, Radis, Mrs. Butman, her son Tom Butman and one Tom Turie; that Mrs. Butman produced a blank form of the will of Kelly, the deceased, which bore Kelly's signature, and that she said to the witness, "This is the will of James Thomas Kelly; I lived with him for seven years and he left his estate to me." Waitches further testified, in substance, that he looked at the papers and noted that they were not filled out, except for the printed matter and the signature of Kelly; that he asked Mrs. Butman who signed the will, and that she stated that Kelly signed it, and that the reason it was not filled out was because at the time it was signed, there was no one who knew how to fill it out; that he asked Mrs. Butman what Kelly said at the time, and that she replied that he said: "I am leaving all my estate to my friend, best friend, Mrs. Bella Butman, subject to the payment of certain funeral expenses," which were fixed at $4,500, "The sum of $1,000 for funeral, $1,000 for a monument, $1,000 for church services and the attorney's fees limited to six per cent, and the administrator's fees limited to four per cent"; that he, Waitches, asked Mrs. Butman who was present beside herself at the time of the signing of the will, and that she replied, Bagdonas, Tom Butman and two other witnesses whose names she did not mention; that he asked Bagdonas if he was present when Kelly signed the blank paper and will, and that he said he, Bagdonas, was, and that he saw Kelly sign the will, of which there were two copies; that Bagdonas stated to

Waitches that he had recommended Waitches as the lawyer for the estate. Waitches further testified that Mrs. Butman stated in his presence, that at the time Kelly signed the blank wills, he was very ill, and that preparations were then being made for him to go to the hospital, and that Bagdonas had made arrangements for Kelly to go to the hospital; that Bagdonas and Mrs. Butman went to a bank and withdrew $700 for the purpose of paying for the hospital; that when they returned from the bank, Bagdonas went to a stationery store and procured blank forms of wills, brought them back, and that Kelly signed them in blank. Waitches testified that at that time, he asked Mrs. Butman and the others present if, in their opinion, Kelly was of sane mind at the time he signed the blank forms, and that they replied that he was but that he was very ill, and that he, Waitches, told these people that in his opinion and under the law, the will as made out would make a good oral will, and that he thereupon put the uncompleted will in the typewriter and filled in the blank spaces; that by mistake he put in the date of a former will, which was January 30, 1935, instead of the correct date, which was February 3, 1935; that he then told the people that though the matter of six per cent as attorney's fees was put in the will, nevertheless, the fees would be controlled by the judge of the probate court. Waitches further testified that he asked these people if the document, as completed by the witness, was filled out as Kelly intended, and that they all said that it was; that he told them that at least two credible witnesses would have to be produced in the probate court to show the actual utterances of Kelly, and that he was of sound mind and disposing memory at the time he made these utterances, and that there should be two witnesses who would testify that the will was reduced to writing and within a certain time. He further testified that he

made up a statement of the amount of the deposits in the various banks, as shown by Kelly's bank books; that after the occurrences referred to, he next saw Radis in connection with the matter at the office of the witness, on March 1, 1935; that Radis then handed the witness the will, and that it was the same document that he had previously testified about; that he then noticed that there were two other signatures besides Kelly's appearing on it, as witnesses, and that the names of the persons were strange to him; that he asked if they had signed it, and Radis answered, "Yes"; that thereafter a priest named Zelink came to his office, and that he Waitches, asked him if he signed the will as a witness, and that Zelink replied that he did, and that Dailyde also had signed it as a witness, and that Dailyde told Waitches that he saw Kelly sign it, and that it was written out according to Kelly's instructions; that Waitches then asked Zelink if he would appear in the probate court and testify as to the matters talked about, and that Zelink said he would, and that Waitches thereupon prepared the petition for filing in the probate court, already referred to. Waitches also stated that he received a bunch of keys, together with bank books belonging to Kelly, and that he knew the usual procedure of the probate court in the matter of filing petitions and the probating of estates of deceased persons, and that he had had about 15 of such cases covering a period of 12 or 13 years; that he handed the will, together with the petition, to the clerk, and that the clerk thereupon fixed a date for the hearing in the matter of the probate of the will; that it was arranged that they were to appear in the probate court on May 16, 1935, at 10 o'clock, and that all the witnesses who were present when Kelly signed the will, were to be present, including those who were present when the will was reduced to writing. On cross-examination, he testified that at the time he

performed the acts referred to in his direct examination in the matter of filling out the blank form of will, he had in mind nuncupative wills. He further stated that he was familiar with the section of the statute concerning nuncupative wills, and that the statute provides that the will should be reduced to writing within twenty days. He also testified that he had the usual publication in the Chicago Law Bulletin for claims against the estate.

The testimony of a number of persons as to the general reputation of the defendant Waitches among his associates as to his honesty, integrity and uprightness prior to March 14, 1935, was offered and received.

Appellant insists that a conspiracy cannot be proved by the acts and declarations of the conspirators done separately, but that the conspiracy itself must be established as an independent fact before the acts and declarations of one conspirator are admissible against the other for any purpose.

In *Ochs v. People,* 124 Ill. 399, a number of members of the board of county commissioners of Cook county, and other employees, were indicted for conspiracy to defraud the county of Cook, and the point raised there was that, although the evidence might tend to show that there were minor conspiracies between certain ones or groups of the accused, or that one performed one part and another one another part, that the evidence did not show a general conspiracy in which all of the defendants were engaged, and that whatever the conspiracy might have been, it is not the one charged in the indictment. In that case, the defendants were found guilty by a jury, and judgment was entered, and in affirming the judgment, the Supreme Court said:

"As respects the law governing in the proof of a conspiracy, it is stated by Archbold, as follows: 'A conspiracy is proved, either expressly, or by the proof

of the facts from which the jury may infer it. It is seldom proved expressly, nor can a case easily be imagined in which that is likely to occur, unless where one or more of the persons implicated in the conspiracy consents to be examined as a witness for the prosecution. In nearly all cases, therefore, the conspiracy is proved by circumstantial evidence, namely, by proof of facts from which the jury may fairly imply it. It is usual to begin by showing that the defendants all knew each other, and that a certain degree of intimacy existed between them, so as to show that their conspiring is not improbable; and if to this can be added evidence of any consultations or private meetings between them, then there is a strong foundation for the evidence to be subsequently given, namely, of the overt acts of each of the defendants in furtherance of the common design. But although the proof above mentioned is desirable, because it satisfies the jury as you proceed, and they are better able to apply the evidence of the overt acts when it is afterwards given, yet it is not essentially necessary, as the jury may imply the conspiracy of all from the overt acts of each.' Archbold's Crim. Pr. and Pl. 619.

"Mr. Greenleaf says: 'The *evidence* in proof of a conspiracy will generally, from the nature of the case, be *circumstantial*. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed, in terms, to have that design, and to pursue it by common means. If it be proved that the defendants pursued, by their acts, the same object, often by the same means, one performing one part, and another another part of the same, so as to complete it, with a view of the attainment of the same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. Nor is it necessary to

prove that the conspiracy originated with the defendants, or that they met during the process of its concoction, for every person entering into a conspiracy or common design already formed, is deemed, in law, a party to all acts done by any of the other parties, before or afterwards, in furtherance of the common design.' 3 Greenleaf on Evidence, sec. 92.

''We have quoted thus at large, because what is thus announced seems completely to meet and dispose of the point as to there being conspiracies in groups, and not one general conspiracy, and of the conspiracy being of another kind than the one charged, and of objections on that score to the reception of the evidence of individual acts which was received, and to be in justification of instructions which were given.''

It is also contended by defendant that the court erred in giving the People's instructions Nos. 11, 21, 24 and 27, and in refusing to give defendant's refused instruction No. 4. People's instructions Nos. 11, 21, 24 and 27 are as follows:

''11. The Court instructs the jury that at the time in question in this case there was, and now is, in full force and effect a law in the State of Illinois in substance as follows: 'All wills and testaments by which any lands or real or personal property are devised or bequeathed shall be reduced to writing and signed by the testator or testatrix, or by some person in his or her presence and by his or her direction, and attested in the presence of the testator or testatrix, by two or more credible witnesses, two of whom declaring on oath or affirmation before the County Court of the proper County that they were present and saw the testator or testatrix sign said will, or testament, in their presence or acknowledged the same to be his or her act and deed, and that they believed the testator or testatrix to be of sound mind and memory at the time of signing or acknowledging the same, shall be

sufficient proof of the execution of said will or testament to admit the same to record.' ''

"21. To constitute the crime of conspiracy, it is not necessary that the conspirators should succeed in their design. It is enough if the common design was formed, in manner and form as charged in the indictment, and that any act was done in furtherance of such design by any one of the conspirators. Nor is any overt act necessary to complete the crime; the offense is complete when the confederacy to pursue the common purpose is made."

"24. The Court instructs the jury, as a matter of law, that the defendant has put in evidence his general reputation for honesty, integrity, uprightness, and for professional conduct and ethics; that such evidence is permissible under the law, and is to be by the jury considered as a circumstance in this case. But the Court further instructs the jury that if from all the evidence in this case they are satisfied beyond a reasonable doubt of the guilt of the accused, then it is the duty of the jury to find him guilty, notwithstanding the fact, if it be a fact, that heretofore the accused has borne a good reputation for honesty, integrity, uprightness, and for professional conduct and ethics."

"27. The Court instructs the jury as a matter of law, that in this state one accused and on trial charged with the commission of a crime may testify in his own behalf or not, as he pleases. You are instructed that when a defendant does testify in his own behalf, then you have no right to disregard his testimony merely because he is accused of crime; that when he does so testify he at once becomes the same as any other witness, and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness; and in determining the degree of credibility that shall be accorded to his testimony, the jury have a right to take into consideration the fact that he

is interested in the result of the prosecution, as well as his demeanor and conduct upon the witness stand; and the jury may also take into consideration the fact, if such is the fact, that he has been corroborated or contradicted by credible evidence, or by facts and circumstances in evidence.''

Instruction No. 4 offered by defendant and refused is as follows:

''4. If the jury believe from the evidence that the defendant, Julius P. Waitches, erred or mistakenly proceeded in the matter here in question, but did not enter into any of the conspiracies and with the intent as charged in the indictment, the jury should find the defendant not guilty.''

People's instruction 11 merely advises the jury as to the law relative to the execution of a will, and is substantially in the language of the statute, and we are unable to see in what particular the defendant could have been damaged. On the contrary, we are of the opinion that under the state of record here, it was a proper instruction for the court to give. As to instruction No. 21, we are of the opinion that it correctly instructed the jury as to the law of conspiracy, as defined by the Supreme Court. See *Ochs v. People*, supra; *Spies v. People*, 122 Ill. 1; *People v. Poindexter*, 243 Ill. 68. As to instructions Nos. 24 and 27, we cannot possibly see how either of these instructions could have in any manner harmed the defendant.

Defendant suggests that in filling out the blanks in the forms of wills signed by the decedent, in having the witnesses' signatures attached to the same, and in offering the will for probate, he was in good faith, attempting to complete a nuncupative will. Paragraphs 17 and 18 of chapter 148, Illinois State Bar Stats. 1935; Jones Ill. Stats. Ann. 110.229, 110.230, provide the manner in which nuncupative wills shall

be completed and offered for probate. They are as follows:

"Par. 17. Sec. 15. A nuncupative will shall be good and available in law for the conveyance of personal property thereby bequeathed, if committed to writing within twenty days after the making thereof, and proven before the county court by two or more credible, disinterested witnesses, who were present at the speaking and publishing thereof, who shall declare, on oath or affirmation, that they were present and heard the testator pronounce the said words, and that they believed him to be of sound mind and memory; and that he or she did at the same time, desire the persons present, or some of them, to bear witness that such was his or her will, or words to that effect; and that such will was made in the time of the last sickness of the testator or testatrix; and it being also proven by two disinterested witnesses, other than those hereinbefore mentioned, that the said will was committed to writing within ten days after the death of the testator or testatrix; and no proof of fraud, compulsion or other improper conduct be exhibited, which, in the opinion of said court, shall be sufficient to invalidate or destroy the same; and all such wills, when proven and authenticated as aforesaid, shall be recorded in like manner as other wills are directed to be recorded by this Act: *Provided, that no letters testamentary shall be granted on such will, until the expiration of sixty days after the death of the testator or testatrix.* (Italics ours.)

"Par. 18. Sec. 16. In all cases where a nuncupative will shall be proved and recorded as aforesaid, the court shall issue a citation to the heirs and legal representatives of the testator or testatrix, if they reside in the county, if not, then said court shall cause an advertisement to be inserted in some one of the newspapers

printed in this State, notifying the said heirs and legal representatives of the testator or testatrix, at what time and place letters testamentary will be granted upon such will, requiring them and each of them to appear and show cause, if any they have, why letters testamentary should not be granted; and if no sufficient cause be shown, letters shall be granted thereon, as in other cases.''

Kelly died on February 26, 1935. A petition for the issuance of letters testamentary to Radis and Bella Butman, named in the will as executors, was filed by defendant on March 6, 1935. Sections 2 and 3 of the same act provide the manner in which statutory wills shall be executed, offered for probate and proved, and are as follows:

''Par. 2. All wills, testaments and codicils, by which any lands, tenements, hereditaments, annuities, rents or goods and chattels are devised, shall be reduced to writing, and signed by the testator or testatrix, or by some person in his or her presence, and by his or her direction, and attested in the presence of the testator or testatrix, by two or more credible witnesses, two of whom, declaring on oath or affirmation, before the County Court of the proper county, that they were present and saw the testator or testatrix sign said will, testament or codicil, in their presence, or acknowledged the same to be his or her act and deed, and that they believed the testator or testatrix to be of sound mind and memory at the time of signing or acknowledging the same, shall be sufficient proof of the execution of said will, testament or codicil, to admit the same to record: Provided, that no proof of fraud, forgery, compulsion or other improper conduct be exhibited, which, in the opinion of said County Court, shall be deemed sufficient to invalidate or destroy the same; and every will, testament or codicil, when thus proven to the satisfaction of the court, shall, together

with the probate thereof, be recorded by the clerk of said court, in a book to be provided by him for that purpose, and shall be good and available in law for the granting, conveying and assuring the lands, tenements and hereditaments, annuities, rents, goods and chattels therein and thereby devised, granted and bequeathed.'' Ill. State Bar Stats. 1935, ch. 148, ¶ 2; Jones Ill. Stats. Ann. 110.214.

''Par. 3. It shall be the duty of each and every witness to any will, testament or codicil, made and executed in this State, as aforesaid, to be and appear before the county court on the regular day for the probate of such will, testament or codicil, to testify of and concerning the execution and validity of the same; and the said court shall have power and authority to attach and punish, by fine and imprisonment, or either, any witness who shall, without a reasonable excuse, fail to appear when duly summoned for the purpose aforesaid: Provided, the said punishment by imprisonment shall in no case exceed the space of twenty days; nor shall a greater fine be assessed, for any such default, than the sum of $50.'' Ill. State Bar Stats. 1935, ch. 148, ¶ 3; Jones Ill. Stats. Ann. 110.215.

Defendant's testimony indicates that he was a practicing lawyer with a number of years experience, and that he had had considerable practice and experience in the probate court of Cook county. According to his testimony, it is shown that every act of his subsequent to the presentation to him of the blank form of will with nothing on it but Kelly's signature, had for its object the filing and proving in the probate court, a completed document as a will, made, executed and filed in conformity with all the statutory requirements. The undisputed evidence is to the further effect that defendant was the adviser of all the persons charged with the conspiracy from the moment he received this

paper into his possession, until it was finally filed in the probate court, and the time was fixed for taking testimony as to its genuineness by the probate court. Under these circumstances, his testimony to the effect that he was merely attempting to establish and prove a nuncupative will, as provided by statute, is not convincing.

The record indicates that the defendant, and the other alleged conspirators, were examined by the probate judge in the probate court as to their acts and doings in connection with the offering of the alleged spurious will of James Thomas Kelly for probate. A court reporter who took and transcribed shorthand notes of the witness's testimony in the probate court was produced by the State as a witness in the criminal court, and over the objection of defendant, testified as to questions propounded to and answers given by the defendant in the probate court. In view of the fact that no error is assigned as to the admission of this testimony in this case and no mention of it is made in defendant's brief, and further in view of the fact that because of defendant's testimony, which shows him to be guilty of the crime charged beyond a reasonable doubt, we are of the opinion that if error was committed in admitting this testimony in this case, it was harmless, and further that defendant has waived any point that might be raised thereon. In our opinion, the case was fairly presented to the jury, and in view of the fact that there is ample evidence to sustain the verdict, the judgment is affirmed.

*Affirmed.*

HEBEL, J., concurs.

DENIS E. SULLIVAN, P. J., dissenting:

I cannot concur in the decision arrived at in the majority opinion or the views therein expressed.

The defendant was previously before this court on charges of a civil contempt of the probate court of Cook county, growing out of some of the transactions involved in this case and the writer concurred in the opinion which was handed down at that time. Defendant now comes before this court charged in an indictment by the grand jury with the crime of conspiracy to defraud. A different situation is here presented and, whether defendant is innocent or guilty, he is entitled to be tried according to the laws of the State in order to determine that fact. I am of the opinion that this was not done. Defendant did not plead guilty. Even if he were guilty, it must be remembered the Supreme Court has many times said that the laws of this State apply to the guilty as well as to the innocent and a conviction cannot be secured excepting under the laws which apply equally to all.

Where a person is convicted by a jury, that conviction should be based upon the hearing of charges as contained in the indictment which should allege that defendant is guilty of violating a law and that someone was unlawfully injured as the result of the acts of the defendant. The jury should not be misled by erroneous instructions as to the law such as the record shows occurred in the trial of this cause.

Sufficient prejudicial errors were committed which entitles the defendant to a reversal of said judgment and a remanding of the cause for a new trial.

To substantiate my opinion I am setting forth the following:

The indictment should have been quashed for the reason that the "Estate of James Thomas Kelly"—which the indictment asserts was defrauded — is not a person, corporation or a legal entity as the statute prescribes. The only persons who could have been defrauded were the possible beneficiaries, such as the

heirs, devisees or legatees, or the State, who, if unknown to the grand jury, could be so alleged.

In *People v. Ernst,* 306 Ill. 452, the court, at page 457, said:

"To constitute the crime of forgery of an instrument it is necessary for the prosecution to prove the forgery was committed with the intent to defraud some person named. (*Fox v. People,* 95 Ill. 71.)"

As was said in the case of *Downey v. Grigsby,* 251 Ill. 568, 572: "The ordinary meaning of the words 'revert to my estate' is, 'return to the aggregate of all the property which I may leave at my death.' . . . The word 'estate' is not equivalent to 'heirs.' When a man makes a will the business in which he engages is the distribution of his estate, usually among his heirs and perhaps other persons. The estate is the subject matter with which he deals; the heirs are possible distributees."

On the death of a landowner intestate the title to the land vests at once in his heirs-at-law under the statute of descent. The heirs hold title in their own right, subject only to the payment of the debts of their ancestor for the purposes as described by law, and may sell and convey their title without hindrance. *Anderson v. Shepard,* 285 Ill. 544.

In the case of *People v. Krittenbrink,* 269 Ill. 244, the court said:

"The ownership of the property was a necessary averment of the indictment and it was necessary to prove such ownership as alleged." This would be equally true in an indictment for a conspiracy to forge or defraud.

It is at once apparent that the "Estate of James Thomas Kelly" does not imply the same to be a person, corporation or an entity that may be the owner of the property or have an interest therein. The "Estate

of James Thomas Kelly" could not take title to such property, it could not sue or be sued and it could not be charged with a crime. It could not be deceived and does not possess the capacity to sustain an injury of any kind. Such combination of words is merely a phrase or title to describe certain proceedings and does not designate the owners or beneficiaries of the properties involved. Consequently, the counts which charge the defendant with being guilty of defrauding the property instead of the owners thereof cannot stand.

Count 13 of the indictment charges several offenses in one count, namely, "with intent to thereby prejudice, damage and defraud any persons, any body politic and any body corporate that would be lawfully entitled to receive said money and property." This language is too vague and indefinite. No evidence is offered to show who these defrauded parties were. Even assuming that the estate of James Thomas Kelly is, as the majority opinion assumes, a sufficient entity, no evidence was introduced in the record to show that in fact there were "any persons, any body politic and any body corporate that would be lawfully entitled to receive said money and property." The jury was left to guess who these parties might be.

I do not believe the State should have been permitted to offer over objection of defendant in its case in chief the testimony of the court reporter who read from his notes taken at the time Judge O'Connell of the probate court conducted the examination of the defendant in the contempt proceedings in that court. To have permitted this to have been done was in direct violation of section 9 of Article 2 of the Constitution which guarantees the right to "meet the witnesses face to face." The evidence shows that while the defendant was on the witness stand, the probate judge

examined him at length. The court made statements of fact while examining the witness implying defendant's guilt or his attempt to conceal the facts. To have permitted that testimony to have been read by the court reporter to the jury in this criminal case was not only a violation of defendant's constitutional rights, but the evidence itself was highly prejudicial and I think the court erred in so doing.

Instruction No. 2 for the State purports to define the crime of forgery and in its description it recites the statute verbatim and tells the jury that *"every person* who shall utter, publish or pass," etc., which manifestly was a very prejudicial instruction for the reason that all the counts in the indictment charging forgery were quashed. The defendant was not being tried for the violation of the statute on forgery. The jury would be very likely to take this instruction to mean that the defendant was guilty, without the necessity of proof. As was said in the case of *People v. Corbishly,* 327 Ill. 312, at page 338: "The vice of giving abstract propositions of law as instructions to a jury is, that the jury are too liable to arrive at the conclusion that the court thinks that the facts stated in such an instruction on which the proposition of law is based have been proved, while the law is that the jury should be required to make the proper finding on such facts."

In the case of *People v. Crane,* 302 Ill. 217, at page 227, the court said: "Counsel for the State argue that it is not error to give an instruction in the language of the statute. This is sometimes true, but where the statute defines more than one crime, as is the case in the section referred to, such rule cannot apply. The contemplation of the law is that the jury shall be instructed only concerning the crime of which the defendant stands charged, and it is not a sufficient answer to say that the instruction is in substantially the

language of the statute. (*People v. Jones,* 263 Ill. 564.)"

Instruction No. 11 is a mere recitation of the statute, which says: "*All wills and testaments,*" etc. The defense in this case was that the defendant intended to make a nuncupative will — a spoken will — disposing of personal property of the deceased; that the defendant was not contending that the will as filed came under section 2 of the act in regard to wills, but that it came under chapter 148, par. 17, Ill. State Bar Stats. 1935, which provides for nuncupative wills. The defense rightfully claims that in stating the law as it did in this instruction, the court entirely destroyed and eliminated a consideration of the defense urged by the defendant relating to nuncupative wills.

Instruction No. 24 for the State minimized the testimony of the judges and others who testified as to the good reputation of the defendant in the community prior to the time of the indictment and attempted to minimize the probative force of such evidence. Said instruction reads in part as follows: ". . . that such evidence is permissible under the law, and is to be by the jury considered as a circumstance in this case." The record shows that this evidence was offered and not contradicted. The language used in this and similar instructions was by implication condemned in the case of *People v. Munday,* 280 Ill. 32, 64. The jury should have been told that it was to be considered as competent evidence and not as a *circumstance* in the case.

Instruction 27 is a lengthy instruction relative to the testimony given by defendant at the trial and contains the following language:

". . . and in determining the degree of credibility that shall be accorded to his testimony, the jury have a right to take into consideration the fact that he is interested in the result of the prosecution, as well as

his demeanor and conduct upon the witness stand; and the jury may also take into consideration the fact, if such is the fact, that he has been corroborated or contradicted by credible evidence, or by facts and circumstances in evidence."

As the Supreme Court said of a similar instruction in the case of *People v. Washington,* 327 Ill. 152, at page 158: "It was error to give this instruction in this case, as it applies these rules to the testimony of plaintiff in error without applying them to the testimony of the other witnesses."

It is not a sufficient answer to these palpable errors to say that the defendant is guilty. A trial by jury is the method provided by law for determining such a question and the trial should be conducted according to the law which in this case, as shown by the record, was not done.

In view of the errors committed at the trial, to which I have called attention, I feel impelled to dissent from the majority opinion. I believe that the judgment of conviction should be reversed and the cause should be remanded for a new trial.